**Timothy W. SPENCER, Petitioner–Appellant,**

v.

**Edward W. MURRAY, Director, Respondent–Appellee.**

**No. 92–4006.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 28, 1992.

Decided Sept. 16, 1993.

J. Lloyd Snook, III, Snook & Haughey, Charlottesville, VA, argued (William T. Linka, Boatwright & Linka, Richmond, VA, on brief), for petitioner-appellant.

Donald Richard Curry, Sr. Asst. Atty. Gen., Richmond, VA (Mary Sue Terry, Atty. Gen. of Virginia, on brief), for respondent-appellee.

Before WIDENER, PHILLIPS, and WILLIAMS, Circuit Judges.

## OPINION

WIDENER, ·Circuit Judge:

Timothy Wilson Spencer attacks a Virginia state court judgment sentencing him to death for the murder of Debbie Dudley Davis. We affirm.

I

The gruesome details of the murder of Debbie Davis can be found in the Supreme Court of Virginia's opinion on direct review, *Spencer v. Commonwealth*, 238 Va. 295, 384

S.E.2d 785 (1989); *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1171, 107 L.Ed.2d 1073 (1990). For our purposes, a brief recitation will suffice. Miss Davis was murdered sometime between 9:00 p.m. on September 18, 1987. and 9:30 a.m. on September 19, 1987. The victim's body was found on her bed by officers of the Richmond Bureau of Police. She had been strangled by the use of a sock and vacuum cleaner hose, which had been assembled into what the Virginia Court called a ligature and ratchet-type device. The medical examiner determined that the ligature had been twisted two or three times, and the cause of death was ligature strangulation. The pressure exerted was so great that, in addition to cutting into Miss Davis's neck muscles, larynx, and voice box, it had caused blood congestion in her head and a hemorrhage in one of her eyes. In addition her nose and mouth were bruised. Miss Davis's hands were bound by the use of shoestrings, which were attached to the ligature device. 384 S.E.2d at 789.

Semen stains were found on the victim's bedclothes. The presence of spermatozoa also was found when rectal and vaginal swabs of the victim were taken. In addition, when the victim's pubic hair was combed, two hairs were recovered that did not belong to the victim. 384 S.E.2d at 789. The two hairs later were determined through forensic analysis to be "consistent with" Spencer's underarm hair. 384 S.E.2d at 789. Further forensic analysis was completed on the semen stains on the victim's bedclothes. The analysis revealed that the stains had been deposited by a secretor whose blood characteristics matched a group comprised of approximately thirteen percent of the population. Spencer's blood and saliva samples revealed that he is a member of that group. 384 S.E.2d at 789.

Next, a sample of Spencer's blood and the semen collected from the bedclothes were subjected to DNA analysis. The results of the DNA analysis, performed by Lifecodes Corporation, a private laboratory, established that the DNA molecules extracted from Spencer's blood matched the DNA molecules extracted from the semen stains. Spencer is a black male, and the evidence adduced at trial showed that the statistical likelihood of finding duplication of Spencer's particular DNA pattern in the population of members of the black race who live in North America is one in 705,000,000 (seven hundred five million). In addition, the evidence also showed that the number of black males living in North America was approximately 10,000,-000 (ten million). 384 S.E.2d at 790.

On September 22, 1988 a Richmond jury found Spencer guilty of rape, burglary, and capital murder. The jury unanimously fixed Spencer's punishment at death, which was affirmed on direct appeal. Spencer then filed a petition for habeas corpus with the state trial court, which was dismissed. He appealed to the Virginia Supreme Court, but because his appeal was filed one day out of time, the Virginia Supreme Court refused the petition. Spencer then filed a petition for a writ of habeas corpus with the United States District Court for the Eastern District of Virginia. The district court denied his petition. *Spencer v. Murray,* No. 3:91CV00391 (E.D.Va. April 30, 1992).

On appeal, Spencer raises essentially five issues [1]: (1) the DNA evidence in this case is unreliable; (2) defense counsel was denied an opportunity to adequately defend against the DNA evidence because the trial court denied a discovery request for Lifecodes' worknotes and memoranda, the trial court refused to provide funds for an expert defense witness,[2]

---

1. We have some problem in determining the precise issues raised in Spencer's brief as there phrased and believe that our statement of the issues is at least inclusive. Compare "Argument" in the table of contents (four principal and fourteen sub-issues), with "Questions Presented," Appellant's Brief at 1, (eight issues), and "Assignments of Error," *id.* at 2 (eight issues).

2. Spencer's contention that the trial court denied him funds for an expert if not frivolous, is little better. When Spencer's counsel argued his mo-

tion for funds for an expert on August 2, 1988, the attorneys advised the court that the "motion was filed merely to put the Court on notice that we will be making the motion." At that time the defense did not have an expert at hand, and the court and Mr. Johnson, one of Spencer's lawyers, had an extended discussion with respect to that subject:

> THE COURT: I want to know what the experts are going to say before I appropriate funds.

and the prosecution did not reveal evidence of problems with Lifecodes' testing methods; (3) the trial court should not have admitted the DNA evidence; (4) the prosecution improperly struck Miss Chrita Shelton from the jury for racially-motivated reasons.as prohibited by *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and (5) the future dangerousness aggravating factor in Virginia's. capital sentencing scheme is unconstitutionally vague.

## II

*Issues and Claims Precluded From Review*

■ The majority of Spencer's claims under issues (1) and (2) cannot be considered. The Circuit Court of the City of Richmond dismissed Spencer's habeas petition on October 10, 1990. *Spencer v. Murray,* No. ML2223 (Cir.Ct. for the City of Richmond, Manchester Courthouse, Oct. 10, 1991). Spencer's habeas appeal to the Virginia Supreme Court was filed on January 11, 1991, which was one day after the deadline for filing set by Rule 5:17(a)(1), Rules of Va.Sup. Ct., had expired. Spencer also filed a request to extend the time for filing that petition for appeal. On March 18, 1991, the Supreme Court of Virginia denied Spencer's motion for extension of time and dismissed the habeas appeal, citing Rule 5:17(a)(1). *Spencer v. Murray,* No. 910055 (Va. March 18, 1991) (two documents). Because the reason for dismissing Spencer's habeas appeal given by the Virginia Supreme Court was a clearly stated adequate and independent state ground, federal habeas review of claims raised in his state habeas appeal is foreclosed unless those claims were otherwise exhausted by being raised on direct appeal. See *Harris v. Reed,* 489 U.S. 255, 262–63, 109 S.Ct. 1038, 1042–43, 103 L.Ed.2d 308 (1989); see also *Coleman v. Thompson,* — U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (U.S. 1991); *Grundler v. North Carolina,* 283 F.2d 798, 800 (4th Cir.1960) ("If a question is presented and adjudicated by the state's highest court once, it is not necessary to urge it upon them a second time under an alternate procedure."). The claims barred from consideration include the claims now made as we have detailed herein about the unreliability of the DNA evidence (issue 1), as well as the claim that the defense could not adequately prepare because the trial court did not provide a defense expert (a part of issue 2).

■ The claim that the defense could not adequately prepare because the trial court

MR. JOHNSON: I am not asking you to do that. We will have that at the appropriate time.

THE COURT: You need an expert to come down here for everything if the money is enough.

MR. JOHNSON: That's true. If we could get them.

THE COURT: Most experts boil down to, how much am I getting paid? A lot of them. So basically, it is, if I know, then we can do it, I will not do that. I see what you are driving at. If you have got somebody to say, an expert, DNA is not a reliable test, I would think that would be a proper issue for the jury to believe, which is what you want. But I am not going to take some doctor, or lawyer, or Indian chief, or what have you, you know, over a whole business world. But I want to know some of his reputation and so forth that would come down to what he really knows about the subject.

MR. JOHNSON: Yes, sir.

THE COURT: *Don't you ever fear that we are going to deny any defense that you might have.* I do not want to go so far as to allow frivolous defenses, and I don't think you want to present those, either. Because that would be damaging to your case.

So when you come in, get your expert, what his credentials are to become an expert. [Y]ou will certainly talk to him, what he is going to say or what he can possibly say. We can find that out.

I have so many experts. I believe there is a handwriting expert. It was supposed to be out in the west. The lady at the trial delayed the trial for three months, sent it out west and came back and said he would testify to the one thing the day before trial. And he eventually said, the State expert is exactly right. I agree with him 100 percent. That's what I am talking about.

When you get that, you let me know.

MR. JOHNSON: Yes, sir, Judge. *Any expert we desire.* (emphasis added)

So, the trial judge not only assured the defense that it could have an expert witness, but also encouraged the defense to get one that would truly be helpful to its case. Spencer's present argument that it was improper for the trial judge to ·refuse to appropriate funds without the defense actually having an expert (and, in fact, admitting that its motion was for notice purposes only) and without knowing that the witness would actually aid the defense is a mischaracterization of the trial judge's thoughtful remarks.

did not grant its request for discovery of Lifecodes' worknotes and memoranda (a part of issue 2) appears to have been raised on direct appeal, see Opening Brief of Appellant in the Supreme Court of Virginia, Nos. 890096 & 890097, at 10. We do not consider this claim, however, because it was not raised in the district court. *McGowan v. Gillenwater*, 429 F.2d 586 (4th Cir.1970) (per curiam). The claim that the defense could not adequately prepare because the prosecution, and its agent, Lifecodes, failed to disclose problems with Lifecodes' testing methods that they knew or should have known existed [3] (a part of issue 2) is not considered because it appears never to have been raised in any state court and therefore is not exhausted. See 28 U.S.C. § 2254(b). Although one claim nominally has been denominated as a *Brady* claim in the federal habeas petition, the district court correctly held that to have been precluded from consideration by the late filing of the state habeas appeal.

The claims properly before us because they were raised in Spencer's direct appeal to the Virginia Supreme Court are issues 3, 4, and 5.

## III

### *Admissibility of the DNA Evidence*

█ Spencer's first claim that we consider is whether Spencer was denied due process of law because the trial court improperly admitted the results of the DNA testing. It has been settled in this circuit for years that a claim about the admissibility of evidence under state law rarely is a claim upon which federal habeas corpus relief can be granted. In 1960 we decided:

> Normally, the admissibility of evidence, the sufficiency of evidence, and instructions to the jury in state trials are matters of state law and procedure not involving federal constitutional issues. It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented.

The role of a federal habeas corpus petition is not to serve as an additional appeal. *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir.1960).

The Supreme Court recently issued a similar holding in *Estelle v. McGuire*, —— U.S. ——, 112 S.Ct. 475, 116 L.Ed.2d 385 (U.S. 1991). In *McGuire*, the Supreme Court was confronted with a ruling under California law that allowed prosecutors to introduce evidence of prior injuries to a child to prove "battered child syndrome" in the context of a murder trial. The Court of Appeals held that the defendant's due process rights were violated in part because the court concluded that the evidence was improperly admitted under state law. The Supreme Court stated that "[s]uch an inquiry" into the application of state evidence law

> is no part of a federal court's habeas review of a state conviction. We have stated many times that federal habeas corpus relief does not lie for errors of state law. Today we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

*McGuire*, —— U.S. at ——, 112 S.Ct. at 480 (citations and internal quotation marks omitted).

In light of the Supreme Court's directive and our own precedent on this subject, we are of opinion that the admission of the DNA test results into evidence did not create "circumstances impugning fundamental fairness or infringing specific constitutional protections." *Grundler*, 283 F.2d at 802. The errors Spencer argues might have occurred with his DNA test, see *infra*, note 5, are not even remotely suggested by the record in this case. The admissibility of the DNA evidence was contested at trial despite the fact that the defense could find no expert witnesses to assist it. See Affidavit at ¶ 8, J.A. at 264–65. On direct review the Virginia Supreme Court applied the Virginia admissi-

---

**3.** Spencer argues that this is a claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

bility test of *O'Dell v. Commonwealth,* 234 Va. 672, 364 S.E.2d 491, *cert. denied,* 488 U.S. 871, 109 S.Ct. 186, 102 L.Ed.2d 154 (1988), and specifically found DNA evidence in general and in this case in particular to be admissible. After reviewing the trial record, the Court noted:

> The record is replete with uncontradicted expert testimony that no "dissent whatsoever [exists] in the scientific community" concerning the reliability of the DNA printing technique. Unrebutted expert testimony further established that the testing procedure performed *in this case* was conducted in a reliable manner.

*Spencer,* 384 S.E.2d at 797 (emphasis added). Further, the New York trial court case of *People v. Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985 (N.Y.Sup.Ct. Bronx County 1989), on which Spencer relies for its argument that DNA tests performed by Lifecodes are inherently suspect does not support that proposition and also is decided under New York law. The errors in *Castro*—contaminated DNA probes, bacterially contaminated samples, and procedures *used in that particular test*—do not appear in the record of Spencer's case.

After a review of the record with respect to the admissibility of the DNA evidence, which includes 150 pages on the motion to prohibit the introduction of the evidence, consisting largely of expert testimony, and 230 pages at trial, again consisting largely of expert testimony, the state Supreme Court affirmed the trial court's holding that the evidence was admissible under the test in *O'Dell,* that the test was reliable. After a review of the same record, we think the decisions of the state courts are not only free from constitutional error under the due process clause, no error at all has come to our attention. Three expert witnesses from Lifecodes, including the people who performed the tests, testified, as did three independent experts not connected with Lifecodes. The gist of all of their testimony was that the tests were reliable and properly performed, and that the DNA evidence showed Spencer to have been the man whose seminal fluid was found in Miss Davis's bed. With the district court, we see nothing improper or

fraudulent about the DNA test results or any evidence of improper procedures in this case.

We are of opinion the DNA evidence was constitutionally admitted, and so hold.

### *Batson Claim*

Spencer's next challenge is to the Commonwealth's use of a peremptory challenge to strike Miss Chrita Shelton from the jury. The record reveals the following exchange on voir dire between Miss Shelton, the trial court, and Mr. Everhart, one of Spencer's attorneys:

THE COURT: ....

This case involves, allegedly, the burglary, rape and murder. The victim's name is Debbie D. Davis. It happened in the Southside of Richmond September, last. The defendant's name is Timothy Spencer. The press has—not necessarily Mr. Spencer, but the person who committed these crimes—has given them the name of the Southside Strangler.

Have you heard anything about these cases?

MS. SHELTON: No.

THE COURT: You haven't read or heard anything about the cases at all?

MS. SHELTON: No.

THE COURT: Then you could sit impartially?

MS. SHELTON: Yes.

....

MR. EVERHART: Ma'am, you say you haven't heard anything about this case?

MS. SHELTON: No.

MR. EVERHART: Have you read any articles or heard any reports about a scientific process called DNA fingerprinting, or DNA printing?

MS. SHELTON: No.

MR. EVERHART: You don't recall that, and you advised [the trial judge] you don't have any predisposition against the death penalty, is that correct, ma'am?

MS. SHELTON: Yes.

The Commonwealth's Attorney later exercised one of his peremptory challenges to strike Miss Shelton. When Spencer's counsel made a *Batson* motion concerning Miss

Shelton and three other potential jurors whose exclusions are not raised to this court, the Commonwealth's Attorney explained his striking Miss Shelton as follows:

> Next, we had Chrita Shelton, who hadn't heard anything about the case. Quite frankly, I am concerned about the literacy and the educational level of someone who has not heard anything about either DNA, or anything about the Southside Strangler, or Timothy Spencer by now in this jurisdiction. The publicity has been extensive, and I am afraid if you heard nothing, as she indicated, she is not an informed citizen. So I did not want that type of individual on the jury.

Spencer argues that the Commonwealth's Attorney's reasons are race-based. He argues that any questions about the degree of Miss Shelton's literacy or that she is not properly educated is evidence of veiled racial bias. In addition, Spencer argues that the objection that Miss Shelton had not heard of DNA fingerprinting was improper because almost none of the potential jurors had heard of it.

We are mindful of our obligation to prevent the use of racially-based motives in the exercise of peremptory challenges. See *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). However, we find that the Commonwealth's Attorney offered a "neutral explanation for challenging [Miss Shelton]." *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723. Although there may be times when a prosecutor's questions and statements during *voir dire* examination may support an inference of discriminatory purpose, see *Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723, this is not one of those times. After a review of the jury selection proceedings, we note that virtually all of the other members of the jury panel had at least heard something about the Southside Strangler. The Commonwealth's Attorney was entitled to strike a potential juror if he found it odd that a juror had heard nothing about a highly publicized case, whether because he believed the potential

juror was not being candid with the court or merely found such obliviousness strange. *Batson* prohibits only the use of discriminatory motives when exercising challenges, nothing more and nothing less. We find no evidence of improper motive here. Spencer's argument about the Commonwealth's Attorney's references to DNA and education takes the remarks out of context,[4] and he offered nothing to the trial court to show that the Commonwealth's Attorney's stated reasons were pretextual or showed any evidence of discriminatory motive. See *United States v. Joe*, 928 F.2d 99, 102 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 71, 116 L.Ed.2d 45 (1991); see also *Hernandez v. New York*, —— U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (U.S.1991). Accordingly, we affirm the district court's finding that there was no merit to Spencer's *Batson* claim.

### Constitutional Challenge to Aggravating Factor

■ Spencer also challenges the future dangerousness aggravating factor contained in Va.Code Ann. § 19.2–264.2. The relevant part of that statute provides:

> In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall ... find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society....

Va.Code Ann. § 19.2–264.2. Spencer argues that this provision has not been meaningfully construed by the Virginia Supreme Court and that the provision fails to channel the jury's discretion in sentencing. We rejected an almost identical challenge in *Giarratano v. Procunier*, 891 F.2d 483, 489–90 (4th Cir. 1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 222, 112 L.Ed.2d 178 (1990), and have previously rejected like challenges. See, e.g., *Briley v. Bass*, 750 F.2d 1238, 1245 (4th Cir.

---

**4.** Spencer's reference to the Commonwealth's Attorney's remark that he wanted to get a jury of "elevated intelligence" also takes the remark out of context. The Commonwealth's Attorney made the remark after giving his reasons for each individual strike, and he was commenting on the fact that another one of the jurors he struck apparently did not know the meaning of the word "impartial."

1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985). We not only have no authority to depart from our prior holdings on this point, see *Caldwell v. Ogden Sea Transp., Inc.,* 618 F.2d 1037, 1041 (4th Cir.1980); see also *U.S. Dep't of Health & Human Servs. v. FLRA,* 983 F.2d 578, 583 (4th Cir.1992) (Judge Murnaghan, concurring and dissenting) (collecting cases), we are not inclined to do so and decide the argument is without merit.

## IV

### Actual Innocence Claims

■ Spencer's argument (issue 1) about the problems with the reliability of DNA evidence is proffered in his brief as not being procedurally barred because it is "RELEVANT TO THE CONSIDERATION OF THE 'ACTUAL INNOCENCE' OF TIMOTHY SPENCER." Spencer argues that the DNA evidence against him at trial was crucial and that the Commonwealth otherwise would have been unable to convict him. Spencer further argues that because of the alleged errors in the testing process[5] his DNA results were flawed and he is "actually innocent." Spencer's argument misses the point of the actual innocence inquiry. "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins,* —— U.S. ——, ——, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (U.S.1993).

Spencer's argument boils down to an assertion that the DNA results were flawed and he was wrongly convicted. This is a claim of *factual* innocence. The errors he points to—potential errors in the results of the DNA test—are errors of fact, not law.

We first note that the potential errors to which Spencer points are not, as he contends, newly discovered evidence[6] in the sense that he has produced affidavits from potential witnesses or otherwise, but instead has proffered rulings from other cases and courts and pre- and post-trial articles from law reviews and scientific journals. Even if we construe his articles and cases as newly discovered evidence, he is not entitled to a hearing or habeas relief. The Supreme Court recently instructed in *Herrera v. Collins,* —— U.S. ——, 113 S.Ct. 853, 122 L.Ed.2d 203 (U.S.1993), that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state proceeding." *Herrera,* —— U.S. at ——, 113 S.Ct. at 860. The Court then stated:

> We may assume, for sake of argument in deciding this case, that in a capital case a

---

**5.** Specifically, Spencer points to a laundry list of problems that *might* have occurred with his DNA test, including:
1. Bandshifting that may have occurred because the tests were not run on same gel;
2. Cross-contamination or bacterial contamination of the samples because Lifecodes' procedures do not guard against these threats;
3. Invalidity because of the lack of data on the reliability of DNA testing of degraded forensic samples;
4. Incorrect matching because visual inspection, rather than computer calculations, were used to declare a match;
5. Invalidity that may have resulted from potentially poor quality control or proficiency standards;
6. Impossibility of verifying results because Lifecodes did not record what voltage they applied to gel;
7. Inability to know whether Lifecodes properly performed tests because there are no standards for licensure or required tests that labs must complete;

8. Improper testimony at trial about the statistical likelihood of finding someone else with same DNA type because of potentially improper application of the product rule;
9. Lack of validation studies to prove reliability of DNA testing in forensic setting and of using sperm to DNA type; and
10. Possible inaccuracies resulting from Lifecodes' use of certain probes.

For an explanation of DNA testing and the techniques used therein, see the trial court's opinion in *People v. Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985 (N.Y.Sup.Ct. Bronx County 1989).

**6.** Spencer repeatedly has urged, in his brief and at oral argument, that the main reason the DNA evidence in this case was found to be admissible is because it was "too new" to have been criticized, because the criticisms were published after his trial, and because Spencer was, according to counsel, the first person ever convicted with DNA evidence in Virginia.

truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

— U.S. at ——, 113 S.Ct. at 869. The Court then decided that Herrera's evidence, which tended to show that his brother had committed the crime and which consisted of sworn affidavits from his brother's son and his brother's lawyer, did not meet the extraordinarily high burden the Court had assumed. —— U.S. at ——, 113 S.Ct. at 869.

Although the Supreme Court did not articulate a standard for the "extraordinarily high burden" a defendant claiming factual innocence would have to show, we conclude with little trouble that Spencer has not met it.[7] His "evidence" of innocence consists of conjecture from articles about potential problems with DNA testing. Spencer also proffers the Supreme Court of New York for Bronx County's trial court decision in *People v. Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985 (1989), a case which took place after Spencer's trial. As we discussed *supra,* the *Castro* decision does not hold that Lifecodes' methods are so flawed that its test results are inadmissible. The *Castro* court was faced with flaws *in the particular test* at issue there. There is not a shred of evidence that those flaws occurred here. Further, in their affidavit submitted to the state habeas court, Spencer's trial attorneys in this case noted that they had worked with the attorneys who represented Spencer in an earlier murder

case in the same series of serial killings in Arlington. Spencer's attorneys had attended the trial and had access to all of the Arlington attorneys' data, including all of the prosecution evidence, which included information about the murder of Miss Davis involved here. Affidavit ¶¶ 5, 7, 9, J.A. at 264–65. In addition, the Arlington attorneys had been successful in having the trial court authorize an independent DNA test from a different laboratory, Cellmark, which confirmed the results from Lifecodes. Affidavit ¶ 9, J.A. at 265. However, Spencer's trial attorneys in this case still kept looking into Lifecodes' testing and submitted the DNA sample to Lifecodes "under a fictitious name and in the guise of a fictitious paternity case." Affidavit ¶ 12, J.A. at 266–67. "The results of this 'blind' testing, however, only confirmed Lifecodes' previous conclusion that the DNA pattern from Spencer's blood matched the DNA pattern from the DNA found in the body fluids at the crime scene." *Id.* Despite all of Spencer's attorneys' efforts, it is clear that there is no reason to believe that Lifecodes' procedures were in error in this case. Spencer is not entitled to another hearing or habeas relief under the factual innocence exception of *Herrera.*

To the extent that Spencer has argued ineffective assistance of counsel because of his trial counsel's performance in contesting the DNA evidence,[8] the affidavit submitted to the state habeas court belies such a claim. To thoroughly discuss his trial counsel's effectiveness would require us to overlook the fact that the claim is defaulted, which we are not willing to do, but we are sure that the outcome would not be any different if we were to reach the merits.

### Sawyer Claim

■ Finally, Spencer asks us to reach the merits of his defaulted claim that defense counsel was denied an opportunity adequately to defend against the DNA evidence be-

---

7. We express no view on whether Spencer has any "state avenue open to process [his] claim." *Herrera,* —— U.S. at ——, 113 S.Ct. at 869. Because he has not met his burden of proving his entitlement to a hearing, it is not necessary for us to take up the question of possible state relief.

8. Once again, Spencer's brief does not make clear in exactly what context Spencer asserts this

claim. Whether proffered as part of his factual innocence claim, as a freestanding constitutional claim, or as excuse for his procedural default, the claim must be exhausted before we can entertain it, which Spencer has failed to do in this case. See, e.g., *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

cause the trial court denied a discovery request for Lifecodes' worknotes and memoranda, the trial court refused to provide funds for an expert defense witness, and the prosecution did not reveal evidence of problems with Lifecodes' testing methods. To reach these claims under the actual innocence exception of *Sawyer v. Whitley*, —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (U.S.1992), we must find that Spencer has shown "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." —— U.S. at ——, 112 S.Ct. at 2515.

Even if we assume, without deciding, that the three alleged errors Spencer points to are of constitutional dimension, we have difficulty in applying the *Sawyer* test. We note that Spencer has not articulated what effect the absence of these presumed errors would have had on a reasonable juror. Instead, this entire case has consisted of possible mistakes he might find and argue to the jury if his requests were granted.[9] Elsewhere we have examined the admissibility of the DNA evidence and found no error, so, to give validity to Spencer's contention, we assume that the argument goes that his cross-examination of the Commonwealth's witnesses would have been helped. We are of opinion, and so hold, that this record does not support a finding that, even if the claimed errors had not occurred, no reasonable juror would have found Spencer eligible for the death penalty under applicable state law.

## V

It is the duty of federal courts on habeas review to "sit to ensure that individuals are not imprisoned in violation of the Constitution." *Herrera,* —— U.S. at ——, 113 S.Ct. at 860. We must always be mindful of our duty to correct these errors, but not to go so far afield that we are invading the province of the States. We find no error concerning the Commonwealth's treatment of the DNA evidence in this case. Before we can grant

habeas relief, a petitioner must show us a violation of the Constitution, laws, or treaties of the United States, and not the mere possibility that one might have occurred.

The judgment of the district court denying Spencer's application for a writ of habeas corpus is accordingly

AFFIRMED.

---

9. For example, in arguing why it was error for the trial court to deny his request for Lifecodes' worknotes and memoranda, Spencer states: "Had the defense had access to Lifecodes' underlying data, and had funds for an expert been approved, it is quite possible that some of the serious problems with Lifecodes' procedures could have been developed in this trial." Appellants' brief at 42.