**Mario Benjamin MURPHY,**
**Petitioner–Appellant,**

v.

**J.D. NETHERLAND, Warden,**
**Respondent–Appellee.**

**Mario Benjamin MURPHY,**
**Petitioner–Appellant,**

v.

**J.D. NETHERLAND, Warden,**
**Respondent–Appellee.**

**United Mexican States, Amicus Curiae.**

Nos. 96–14, 96–21.

United States Court of Appeals,
Fourth Circuit.

Argued April 9, 1997.

Decided June 19, 1997.

**ARGUED:** Robert Franklin Brooks, Sr., Hunton & Williams, Richmond, Virginia, for Appellant. Donald Richard Curry, Senior Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellee. **ON BRIEF:** William H. Wright, Jr., Hunton & Williams, Richmond, Virginia; Michele J. Brace, Virginia Capital Representation Resource Center, Richmond, Virginia, for Appellant. James S. Gilmore, III, Attorney General of Virginia, Office of the Attorney General, Richmond, Virginia, for Appellee. Professor John Charles Boger, Chapel Hill, North Carolina; Professor John B. Quigley, Ohio State University College of Law, Columbus, Ohio; S. Adele Shank, Columbus, Ohio, for Amicus Curiae.

Before NIEMEYER, LUTTIG, and MICHAEL, Circuit Judges.

Dismissed by published opinion. Judge LUTTIG wrote the opinion, in which Judge NIEMEYER and Judge MICHAEL concur.

## OPINION

LUTTIG, Circuit Judge:

Appellant Mario Murphy pleaded guilty in the Circuit Court of the City of Virginia Beach to murder-for-hire and to conspiracy to commit capital murder and was sentenced to death. He now appeals the federal district court's denial of his habeas petition, in which he argued that the Commonwealth of Virginia violated his rights under the Vienna Convention on Consular Relations by failing to inform him that he could contact the Mexican consulate. Because Murphy has not made a "substantial showing of the denial of a constitutional right," we deny his motion for a certificate of appealability and dismiss the appeal. 28 U.S.C. § 2253(c).

### I.

Murphy was hired by James Radcliff's wife, Robin Radcliff, and her lover, Gary Hinojosa, to kill James Radcliff for $5,000. After the failure of a plan in which Robin was to pretend like her car had broken down and then Murphy was to kill James when he came to help her, Murphy recruited two cohorts, Aaron Turner and James Hall, to help stage a burglary in which they would kill James Radcliff. Robin Radcliff helped Murphy prepare for the killing by driving him to the apartment complex where she lived, pointing out her husband's car, and telling Murphy the specific bedroom in which James slept. *Murphy v. Commonwealth*, 246 Va. 136, 431 S.E.2d 48, 50 (1993). On July 28, 1991, Murphy, Turner, and Hall met at Hinojosa's residence, where they dressed in dark clothes and armed themselves with a metal pipe and two knives before going to the Radcliffs' apartment. When the three assailants arrived at the Radcliffs' apartment, they entered through a window that Robin had unlocked as planned. According to the Virginia Supreme Court:

> When Murphy, Turner, and Hall entered the hallway leading to the bedroom, Robin left the bedroom, walked past the assailants, and went to the living room. The three men entered the bedroom where James was sleeping and closed the door. Turner struck James "pretty hard" in the head with a metal pipe. James then sat up in bed and Turner handed the pipe to Murphy, who hit James in the head with the pipe at least twice.

> James appeared to be "knocked out" as a result of the blows to his head. Murphy and Turner began stabbing him. Murphy "had a big rush of adrenaline" and he stabbed the victim twice, "once in the front of . . . his upper body and then once in the back." Turner placed a knife to James' neck and "tried to slit his throat." Hall, "right behind" Murphy and Turner, was hitting James with a pipe.

> James "was just laying in the bed bleeding." Murphy grabbed a telephone and handed it to Hall, who "ripped it out of the

wall." Murphy, Turner, and Hall ran from the bedroom to the living room, where they removed a videocassette recorder and a video game. Hinojosa, Robin, and Tina and Michael Bourne had instructed them to remove these items "to make it look like a burglary." Murphy, Turner and Hall placed these items in a duffel bag. They left the apartment through the window that they had entered.

*Id.*, 431 S.E.2d at 50–51. After the police arrived, James Radcliff was taken to the hospital where he was pronounced dead.

When Murphy was arrested by the Virginia Beach police on September 4, 1992, he waived his constitutional rights and confessed to killing James Radcliff. *Id.* at 51. Murphy pleaded guilty in the Circuit Court of the City of Virginia Beach to murder-for-hire and to conspiracy to commit capital murder. The court entered convictions on both counts, and expressly found that Murphy's pleas were voluntary and intelligent. J.A. at 13–19, 687–89. After a separate sentencing hearing, the court found that Murphy's conduct constituted "aggravated battery" and demonstrated "depravity of mind" and that Murphy represented "a continuing serious threat to society." J.A. at 135–138. The Court sentenced Murphy to death for the murder of James Radcliff and imposed a twenty-year sentence for the conspiracy conviction. J.A. at 138. The convictions and sentences were affirmed by the Virginia Supreme Court.

The state courts also dismissed Murphy's state habeas claims, finding them all to be either procedurally barred or without merit. Murphy noted an appeal to the Virginia Supreme Court on August 24, 1994, but did not file his petition for appeal until November 2, 1994, one day too late under Virginia law. The Virginia Supreme Court dismissed the appeal as untimely.

Murphy filed his federal habeas petition on April 30, 1996, claiming, among other things, that both his conviction and death sentence are constitutionally invalid because the Virginia Beach authorities failed to notify him that, as a foreign national of Mexico, he had a right under the Vienna Convention on Consular Relations to contact the consulate of Mexico.[1] J.A. at 474–83. The district court rejected all of his claims, holding that his Vienna Convention claim was procedurally defaulted because it had not been raised in state court. J.A. at 774–84.

On appeal, Murphy's principal argument is that his Vienna Convention Rights were violated. As an extension of this argument, Murphy argues for the first time on appeal that the violation of the Vienna Convention rendered his guilty plea involuntary.

## II.

■ In order to obtain a certificate of appealability, a petitioner whose habeas petition was denied by a district court must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).[2] Murphy's argument that his

---

1. Article 36(1)(b) of the Vienna Convention provides:

   [I]f he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending state if, within its consular district, a national of that state is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph.

   21 U.S.T. at 101.

2. Section 2253 provides:

   (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
   (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
   (B) the final order in a proceeding under section 2255.
   (2) *A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.*
   (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).
   28 U.S.C. § 2253 (emphasis added). There is no issue regarding retroactivity in this case because Murphy filed his federal habeas petition six days

rights under the Vienna Convention were violated does not satisfy section 2253(c)(2)'s requirement because even if the Vienna Convention on Consular Relations could be said to create individual rights (as opposed to setting out the rights and obligations of signatory nations), it certainly does not create *constitutional* rights. Although states may have an obligation under the Supremacy Clause to comply with the provisions of the Vienna Convention, the Supremacy Clause does not convert violations of treaty provisions (regardless whether those provisions can be said to create individual rights) into violations of *constitutional* rights. Just as a state does not violate a constitutional right merely by violating a federal statute, it does not violate a constitutional right merely by violating a treaty. *See Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829) (stating that a treaty must "be regarded in courts of justice as equivalent to an act of the legislature").

■ Even were the district court's denial of habeas relief appealable, we would find Murphy's Vienna Convention claim to be procedurally barred because he did not raise it in state court and he cannot show cause and prejudice for his default. Murphy argues that there was cause for his failure to raise the Vienna Convention claim in state court because of the novelty of this claim and because the state failed to advise him of his "rights" under the Convention. However, not only did Murphy never raise his novelty argument in the district court, there is absolutely no cause for his not having done so. The Vienna Convention, which is codified at 21 U.S.T. 77, has been in effect since 1969, and a reasonably diligent search by Murphy's counsel, who was retained shortly after Murphy's arrest and who represented Murphy throughout the state court proceedings, would have revealed the existence and applicability (if any) of the Vienna Convention. Treaties are one of the first sources that would be consulted by a reasonably diligent counsel representing a foreign national. Counsel in other cases, both before and since

Murphy's state proceedings, apparently had and have had no difficulty whatsoever learning of the Convention. *See, e.g., Faulder v. Johnson,* 81 F.3d 515, 520 (5th Cir.1996); *Waldron v. I.N.S.,* 17 F.3d 511, 518 (2d Cir. 1993); *Mami v. Van Zandt,* No. 89 Civ. 0554, 1989 WL 52308 (S.D.N.Y. May 9, 1989); *United States v. Rangel–Gonzales,* 617 F.2d 529, 530 (9th Cir.1980); *United States v. Calderon–Medina,* 591 F.2d 529 (9th Cir. 1979); *United States v. Vega–Mejia,* 611 F.2d 751, 752 (9th Cir.1979). Indeed, Murphy's primary argument is that "[e]ven the most diligent counsel would have been sorely pressed to recognize the existence" of the Vienna Convention prior to the publication of *Faulder v. Johnson,* 81 F.3d 515 (5th Cir. 1996), Appellant's Br. at 22. Apparently unbeknownst to Murphy's appellate counsel, however, Faulder's attorney discovered the Convention prior to the December 2, 1992 filing of Faulder's habeas petition, over a year before Murphy filed his state habeas petition. Nor can the Commonwealth's failure to notify Murphy of any rights he may have had under the Vienna Convention constitute cause for failure to raise his Vienna Convention claim in state court, as Murphy has shown no "external impediment preventing [his] counsel from constructing or raising the claim." *Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 2648, 91 L.Ed.2d 397 (1986). The legal basis for the Vienna Convention claim could, as noted above, have been discovered upon a reasonably diligent investigation by his attorney, and the factual predicate for that claim—that Murphy is a citizen of Mexico—was obviously within Murphy's knowledge.

■ Murphy has also failed to establish prejudice from the alleged violation of the Vienna Convention because he is unable to explain how contacting the Mexican consulate would have changed either his guilty plea or his sentence. Murphy argues that he was prejudiced by the Commonwealth's failure to notify him of his right to contact the Mexican consulate because the consulate could have helped him either obtain a plea bargain or

after the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214, was signed into law.

obtain mitigating evidence for the sentencing hearing. As to the assistance that might have been provided with respect to the plea bargain, Murphy argues that, because his cohorts did not receive the death penalty, his death sentence must have been the result of ethnic discrimination which somehow could have been avoided by help from the Mexican consulate. Presumably, this is some sort of help that his attorney was unable to provide but that would have led the prosecutor to offer Murphy a lighter plea. The prosecutor in Murphy's case, however, stated "unequivocally" that Murphy's attorney approached him for a plea bargain and that he "would not have entered into a plea agreement with Murphy under any circumstances because of Murphy's primary role in the murder and the fact that he recruited others to participate in the murder." J.A. at 787. In light of Murphy's greater culpability, the prosecutor's decision to offer plea bargains to the other defendants but not to Murphy is obviously reasonable and nondiscriminatory. Furthermore, even if the prosecution's refusal to offer a plea bargain was discriminatory, Murphy offers no evidence that the Mexican consulate could have offered any assistance that his attorney did not. There is also no evidence to support Murphy's generalized assertion that the Mexican consulate could have helped him obtain mitigating evidence from Mexico that would have affected his sentencing hearing. As the district court found, Murphy has made "no showing of what evidence the Mexican consulate would have produced." J.A. at 781–82. Furthermore, Murphy's assertion that the Mexican consulate could have helped him obtain character testimony from his relatives in Mexico does not establish prejudice because Murphy has failed to show how assistance from the consulate was necessary to obtain such testimony and because such character testimony would have been largely duplicative of the character testimony that was actually presented at the sentencing hearing. J.A. at 59–61, 63–75.

### III.

Perhaps in an attempt to make a "substantial showing of the denial of a constitutional right," and thereby to obtain a certificate of appealability, Murphy argues for the first time on appeal that his guilty plea was involuntary because of the state's failure to advise him of his Vienna Convention "rights." Because Murphy did not even raise this claim in his *federal* habeas petition, much less his state habeas petition, it plainly cannot provide a ground for relief.[3] Furthermore, this claim is procedurally barred for the same reasons that the substantive Vienna Convention claim is barred. Thus, although the involuntary plea argument constitutes a claimed violation of a constitutional right, it in no way constitutes a "*substantial* showing of the denial of a constitutional right" as required in order to obtain a certificate of appealability. 28 U.S.C. § 2253 (emphasis added). Thus, we deny the certificate of appealability on the involuntary plea claim and find that that claim, too, would fail even were it appealable.

The appeal is dismissed pursuant to 28 U.S.C. § 2253.

*DISMISSED.*

---

3. In Claim B of his federal habeas petition, Murphy alleged that his guilty plea was invalid because "at the time of his plea, Mario had not been advised of a viable defense to the charge of capital murder." J.A. at 207. This "viable defense," however, was that his trial counsel did not advise him that the state had to prove that he committed the murder *for hire*. J.A. at 208. Although Murphy eventually amended his federal habeas petition to add a substantive Vienna Convention claim, that additional claim was not a claim that his plea was involuntary. J.A. at 474–82. Murphy's suggestion that he somehow incorporated the Vienna Convention/involuntary plea claim into his petition when he referred to such a claim in a footnote in his opposition to the Warden's motion to dismiss the habeas claim is to no avail.