**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ANGEL FRANCISCO BREARD,
<u>Petitioner-Appellant,</u>

v.

SAMUEL V. PRUETT, Warden,
Mecklenburg Correctional Center,

No. 96-25

<u>Respondent-Appellee.</u>

THE HUMAN RIGHTS COMMITTEE OF
THE AMERICAN BRANCH OF THE
INTERNATIONAL LAW ASSOCIATION,
<u>Amicus Curiae.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-96-366-3)

Argued: October 1, 1997

Decided: January 22, 1998

Before HAMILTON and WILLIAMS, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Hamilton wrote the opinion, in
which Judge Williams joined. Senior Judge Butzner wrote a concur-
ring opinion.

_____

**COUNSEL**

**ARGUED:** William Gray Broaddus, MCGUIRE, WOODS, BATTLE
& BOOTHE, L.L.P., Richmond, Virginia, for Appellant. Donald

Richard Curry, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Alexander H. Slaughter, Dorothy C. Young, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia; Michele J. Brace, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Richmond, Virginia, for Appellant. Jeffrey L. Bleich, San Francisco, California, for Amicus Curiae.

_____

**OPINION**

HAMILTON, Circuit Judge:

Following a jury trial in the Circuit Court for Arlington County, Virginia, Angel Francisco Breard, a citizen of both Argentina and Paraguay, was convicted and sentenced to death for the murder of Ruth Dickie. He now appeals the district court's denial of his petition for writ of habeas corpus. See 28 U.S.C.§ 2254. We affirm.

I

In February 1992, Ruth Dickie resided alone at 4410 North Fourth Road, Apartment 3, in Arlington County, Virginia. At about 10:30 or 10:45 p.m. on February 17, 1992, Ann Isch, who lived in an apartment directly below Dickie's, heard Dickie and a man arguing loudly in the hall. According to Isch, the arguing continued as she heard Dickie and the man enter Dickie's apartment. Almost immediately thereafter, Isch called Joseph King, the maintenance person for the apartment complex. Upon arriving at Dickie's apartment, King knocked on the door and heard a noise that sounded like someone was being dragged across the floor. After receiving no response to his knocking, King called the police.

When the police arrived, they entered Dickie's apartment with a master key that King provided. Upon entering the apartment, the police found Dickie lying on the floor. She was on her back, naked from the waist down, and her legs were spread. She was bleeding and did not appear to be breathing. The police observed body fluid on Dickie's pubic hair and on her inner thigh. Hairs were found clutched

2

in her bloodstained hands and on her left leg. Dickie's underpants had been torn from her body. A telephone receiver located near her head was covered with blood.

An autopsy revealed that Dickie had sustained five stab wounds to the neck; two of which would have caused her death. Foreign hairs found on Dickie's body were determined to be identical in all microscopic characteristics to hair samples taken from Breard. Hairs found clutched in Dickie's hands were Caucasian hairs microscopically similar to Dickie's own head hair and bore evidence that they had been pulled from her head by the roots. Semen found on Dickie's pubic hair matched Breard's enzyme typing in all respects, and his DNA profile matched the DNA profile of the semen found on Dickie's body.

Breard was indicted on charges of attempted rape and capital murder. Following a jury trial, he was convicted of both charges. The jury fixed Breard's punishment for the attempted rape at ten years' imprisonment and a $100,000 fine. In the bifurcated proceeding, the jury heard evidence in aggravation and mitigation of the capital murder charge. Based upon findings of Breard's future dangerousness and the vileness of the crime, the jury fixed Breard's sentence at death. The trial court sentenced Breard in accordance with the jury's verdicts.

Breard appealed his convictions and sentences to the Supreme Court of Virginia, and that court affirmed. See Breard v. Commonwealth, 445 S.E.2d 670 (Va. 1994). On October 31, 1994, the United States Supreme Court denied Breard's petition for a writ of certiorari. See Breard v. Virginia, 513 U.S. 971 (1994).

On May 1, 1995, Breard sought state collateral relief in the Circuit Court for Arlington County by filing a petition for writ of habeas corpus. On June 29, 1995, the circuit court dismissed the petition. On January 17, 1996, the Supreme Court of Virginia refused Breard's petition for appeal.

Breard then sought federal collateral relief in the United States District Court for the Eastern District of Virginia by filing a petition for writ of habeas corpus on August 30, 1996. On November 27, 1996, the district court denied relief. See Breard v. Netherland, 949 F. Supp.

3

1255 (E.D. Va. 1996). On December 24, 1996, Breard filed a timely notice of appeal. On April 7, 1997, the district court granted Breard's application for a certificate of appealability as to all issues raised by Breard in his application. See 28 U.S.C.§ 2253; Fed. R. App. P. 22.

II

A

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), amended, among other things, 28 U.S.C. § 2244 and §§ 2253-2255, which are parts of the Chapter 153 provisions that govern all habeas proceedings in federal courts. The AEDPA, which became effective on April 24, 1996, also created a new Chapter 154, applicable to habeas proceedings against a state in capital cases. The new Chapter 154 applies, however, only if a state "opts in" by establishing certain mechanisms for the appointment and compensation of competent counsel. In Lindh v. Murphy, 117 S. Ct. 2059 (1997), the Supreme Court held that § 107(c) of the AEDPA, which explicitly made new Chapter 154 applicable to cases pending on the effective date of the AEDPA, created a "negative implication . . . that the new provisions of chapter 153 generally apply only to cases filed after the Act became effective." Id. at 2068. Thus, under Lindh , if a habeas petition was filed before April 24, 1996, the pre-AEDPA habeas standards apply. See Howard v. Moore, 1997 WL 755428, at *1 (4th Cir. Dec. 9, 1997) (en banc) ("Howard filed his habeas petition in the district court prior to April 26, 1996, the effective date of the AEDPA. We, therefore, review Howard's claims under pre-AEDPA law." (footnote omitted)). For habeas petitions filed after April 24, 1996, then, the Chapter 153 provisions apply, see Murphy v. Netherland, 116 F.3d 97, 99-100 & n.1 (4th Cir. 1997) (applying amended § 2253 in case where state prisoner filed federal habeas petition after the effective date of the AEDPA), and the Chapter 154 provisions apply if the state satisfies the "opt-in" provisions.

Breard filed his federal habeas petition on August 30, 1996. Accordingly, the Chapter 153 provisions apply. See Howard, 1997 WL 755428, at *1. With respect to the Chapter 154 provisions, the district court held that they did not apply because the Commonwealth

4

of Virginia did not satisfy the "opt-in" provisions of the AEDPA. <u>See Breard v. Netherland</u>, 949 F. Supp. at 1262. Because the Commonwealth of Virginia has not appealed this ruling and the record is not developed on this point, we decline to address whether the Commonwealth of Virginia's mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel satisfies the "opt-in" provisions of the AEDPA. <u>Cf. Bennett v. Angelone</u>, 92 F.3d 1336, 1342 (4th Cir.) (declining to decide whether the procedures established by the Commonwealth of Virginia for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel satisfy the "opt-in" requirements, which would render those provisions applicable to indigent Virginia prisoners seeking federal habeas relief from capital sentences if an initial state habeas petition was filed after July 1, 1992), <u>cert. denied</u>, 117 S. Ct. 503 (1996). However, we are confident that the "opt-in" provisions are of no help to Breard.

B

Initially, Breard contends that his convictions and sentences should be vacated because, at the time of his arrest, the Arlington County authorities failed to notify him that, as a foreign national, he had the right to contact the Consulate of Argentina or the Consulate of Paraguay pursuant to the Vienna Convention on Consular Relations, <u>see</u> 21 U.S.T. 77. The Commonwealth of Virginia argues that Breard did not raise his Vienna Convention claim in state court and thus failed to exhaust available state remedies. Furthermore, because Virginia law would now bar this claim, the Commonwealth of Virginia argues that Breard has procedurally defaulted this claim for purposes of federal habeas review. The district court held that, because Breard had never raised this claim in state court, the claim was procedurally defaulted and that Breard failed to establish cause to excuse the default. <u>See Breard v. Netherland</u>, 949 F. Supp. at 1263. Breard's failure to raise this issue in state court brings into play the principles of exhaustion and procedural default.

In the interest of giving the state courts the first opportunity to consider alleged constitutional errors occurring in a state prisoner's trial and sentencing, a state prisoner must exhaust all available state remedies before he can apply for federal habeas relief. <u>See Matthews v.</u>

5

Evatt, 105 F.3d 907, 910-11 (4th Cir.), cert. denied, 118 S. Ct. 102 (1997); see also 28 U.S.C. § 2254(b). To exhaust state remedies, a habeas petitioner must fairly present the substance of his claim to the state's highest court. See Matthews, 105 F.3d at 911. The exhaustion requirement is not satisfied if the petitioner presents new legal theories or factual claims for the first time in his federal habeas petition. See id. The burden of proving that a claim is exhausted lies with the habeas petitioner. See Mallory v. Smith, 27 F.3d 991, 994 (4th Cir. 1994).

A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default. If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Id. at 735 n.1.

Under Virginia law, "a petitioner is barred from raising any claim in a successive petition if the facts as to that claim were either known or available to petitioner at the time of his original petition." Hoke v. Netherland, 92 F.3d 1350, 1354 n.1 (4th Cir.) (internal quotes omitted), cert. denied, 117 S. Ct. 630 (1996); Va. Code Ann. § 8.01-654(B)(2) ("No writ [of habeas corpus ad subjeciendum] shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition."). Breard contends that he had no reasonable basis for raising his Vienna Convention claim until April 1996 when the Fifth Circuit decided Faulder v. Johnson, 81 F.3d 515 (5th Cir.), cert. denied, 117 S. Ct. 487 (1996). In that case, the court held that an arrestee's rights under the Vienna Convention were violated when Texas officials failed to inform the arrestee of his right to contact the Canadian Consulate. Id. at 520. Breard further maintains that he could not have raised his Vienna Convention claim in his state habeas petition because the Commonwealth of Virginia failed to advise him of his rights under the Vienna Convention. These allegations, however, are inadequate to demon-

6

strate that the facts upon which Breard bases his Vienna Convention claim were unavailable to him when he filed his state habeas petition.

In Murphy, we rejected a state habeas petitioner's contention that the novelty of a Vienna Convention claim and the state's failure to advise the petitioner of his rights under the Vienna Convention could constitute cause for the failure to raise the claim in state court. See 116 F.3d at 100. In reaching this conclusion, we noted that a reasonably diligent attorney would have discovered the applicability of the Vienna Convention to a foreign national defendant and that in previous cases claims under the Vienna Convention have been raised:

> The Vienna Convention, which is codified at 21 U.S.T. 77, has been in effect since 1969, and a reasonably diligent search by Murphy's counsel, who was retained shortly after Murphy's arrest and who represented Murphy throughout the state court proceedings, would have revealed the existence and applicability (if any) of the Vienna Convention. Treaties are one of the first sources that would be consulted by a reasonably diligent counsel representing a foreign national. Counsel in other cases, both before and since Murphy's state proceedings, apparently had and have had no difficulty whatsoever learning of the Convention. See, e.g., Faulder v. Johnson, 81 F.3d 515, 520 (5th Cir. 1996); Waldron v. I.N.S., 17 F.3d 511, 518 (2d Cir. 1993); Mami v. Van Zandt, No. 89 Civ. 0554, 1989 WL 52308 (S.D.N.Y. May 9, 1989); United States v. Rangel-Gonzales , 617 F.2d 529, 530 (9th Cir. 1980); United States v. Calderon-Medina, 591 F.2d 529 (9th Cir. 1979); United States v. Vega-Mejia, 611 F.2d 751, 752 (9th Cir. 1979).

Id.

Murphy forecloses any argument that Breard could not have raised his Vienna Convention claim at the time he filed his initial state habeas petition in May 1995. Accordingly, Breard's Vienna Convention claim would be procedurally defaulted if he attempted to raise it in state court at this time. Having reached this conclusion, we can only address Breard's defaulted Vienna Convention claim if he "can demonstrate cause for the default and actual prejudice as a result of

7

the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

In order to demonstrate "cause" for the default, Breard must establish "that some objective factor external to the defense impeded counsel's efforts" to raise the claim in state court at the appropriate time. Murray v. Carrier, 477 U.S. 478, 488 (1986); see also Murphy, 116 F.3d at 100 (applying Murray and finding that petitioner failed to establish cause to excuse the default of his Vienna Convention claim). For the same reasons discussed above, Breard asserts that the factual basis for his Vienna Convention claim was unavailable to him at the time he filed his state habeas petition and, therefore, he has established cause. But, under Murphy, Breard's showing is insufficient to allow this court to conclude that the factual basis for his Vienna Convention claim was unavailable. Consequently, there is no cause for the procedural default. Accordingly, we do not discuss the issue of prejudice. See Kornahrens v. Evatt, 66 F.3d 1350, 1359 (4th Cir. 1995) (noting that once court finds the absence of cause, court should not consider the issue of prejudice to avoid reaching alternative holdings), cert. denied, 116 S. Ct. 1575 (1996).

Finally, we find it unnecessary to address the issue of whether the AEDPA abrogated the "miscarriage of justice" exception to the procedural default doctrine. Assuming arguendo that the AEDPA has not eliminated the miscarriage of justice exception articulated in Murray, 477 U.S. at 495-96 (miscarriage of justice exception available to those who are actually innocent), and Sawyer v. Whitley, 505 U.S. 333, 350 (1992) (miscarriage of justice exception available to those who are actually innocent of the death penalty, i.e., those habeas petitioners who prove by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty), no miscarriage of justice occurred here. In no set of circumstances has Breard made a showing that he is actually innocent of the offense he committed, see Murray , 477 U.S. at 495-96, or innocent of the death penalty in the sense that no reasonable juror would have found him eligible for the death penalty, see Sawyer, 505 U.S. at 350. Accordingly, Breard is entitled to no relief on his Vienna Convention claim.

8

C

Breard also contends that his death sentence violates <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), and its progeny. In asserting this claim, Breard argues that: (1) given the prosecutor's alleged offer to forego the death penalty if Breard would plead guilty, the prosecutor violated his constitutional rights by seeking and obtaining a death sentence once Breard insisted upon pleading not guilty; (2) the Commonwealth of Virginia imposes the death penalty arbitrarily in capital murder cases; and (3) his death sentence is unconstitutionally disproportionate. The first two claims mentioned above were never raised in state court. The remaining claim was raised on direct appeal, but only as a state law claim, and on the appeal from the denial of state habeas relief the Virginia Supreme Court found this claim procedurally barred under the rule of <u>Slayton v. Parrigan</u>, 205 S.E.2d 680 (Va. 1974) (holding that issues not properly raised on direct appeal will not be considered on state collateral review). Because Breard has not established cause for the obvious procedural default of these claims or that a miscarriage of justice would result by our failure to consider any one of these claims, we cannot address the merits.

D

Finally, Breard argues that the aggravating circumstances instructions given by the trial court are unconstitutionally vague. This claim is not procedurally barred because the Supreme Court of Virginia rejected it on direct appeal. <u>See Breard v. Commonwealth</u>, 445 S.E.2d at 675. In his brief, Breard concedes that we have upheld similar instructions in the recent cases of <u>Bennett</u>, 92 F.3d at 1345 (rejecting vagueness challenge to the Commonwealth of Virginia's vileness aggravating circumstance), and <u>Spencer v. Murray</u>, 5 F.3d 758, 764-65 (4th Cir. 1993) (rejecting vagueness attack on the future dangerousness aggravator). Furthermore, Breard states that he is raising this claim on appeal only "to preserve this claim for future review should such be necessary." <u>See</u> Petitioner's Br. at 37. As a panel of this court, we are bound by <u>Bennett</u> and <u>Spencer</u>, <u>see Jones v. Angelone</u>, 94 F.3d 900, 905 (4th Cir. 1996) (one panel of this court may not overrule another panel's decision); therefore, we must reject Breard's attack on the constitutionality of the aggravating circumstances instructions given by the trial court.

9

III

For the reasons stated herein, the judgment of the district court is affirmed.

<u>AFFIRMED</u>

BUTZNER, Senior Circuit Judge, concurring:

I concur in the denial of the relief requested by Angel Francisco Breard. I write separately to emphasize the importance of the Vienna Convention.

I

The Vienna Convention facilitates "friendly relations among nations, irrespective of their differing constitutional and social systems." The Vienna Convention on Consular Relations, <u>opened for signature</u> Apr. 24, 1963, 21 U.S.T. 78, 79 (<u>ratified by the United States</u> Nov. 12, 1969). Article 36, provides:

> 1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
>
> * * *
>
> (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph;

10

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended. Id. at 101.

II

The Vienna Convention is a self executing treaty--it provides rights to individuals rather than merely setting out the obligations of signatories. See Faulder v. Johnson, 81 F.3d 515, 520 (5th Cir. 1996) (assuming the same). The text emphasizes that the right of consular notice and assistance is the citizen's. The language is mandatory and unequivocal, evidencing the signatories' recognition of the importance of consular access for persons detained by a foreign government.

The provisions of the Vienna Convention have the dignity of an act of Congress and are binding upon the states. See Head Money Cases, 112 U.S. 580, 598-99 (1884). The Supremacy Clause mandates that rights conferred by a treaty be honored by the states. United States Const. art. VI, cl. 2. The provisions of the Convention should be implemented before trial when they can be appropriately addressed. Collateral review is too limited to afford an adequate remedy.

III

The protections afforded by the Vienna Convention go far beyond Breard's case. United States citizens are scattered about the world--

as missionaries, Peace Corps volunteers, doctors, teachers and students, as travelers for business and for pleasure. Their freedom and safety are seriously endangered if state officials fail to honor the Vienna Convention and other nations follow their example. Public officials should bear in mind that "international law is founded upon mutuality and reciprocity . . . ." Hilton v. Guyot, 159 U.S. 113, 228 (1895).

The State Department has advised the states, including Virginia, of their obligation to inform foreign nationals of their rights under the Vienna Convention. It has advised states to facilitate consular access to foreign detainees. Prosecutors and defense attorneys alike should be aware of the rights conferred by the treaty and their responsibilities under it. The importance of the Vienna Convention cannot be overstated. It should be honored by all nations that have signed the treaty and all states of this nation.

12