**UNITED STATES of America,**
**Plaintiff,**

v.

**Armando TAPIA–MENDOZA**
**Defendant.**

**No. 98CR381.**

United States District Court,
D. Utah,
Central Division.

March 10, 1999.

Michelle M. Christiansen, Assistant United States Attorney, for United States, plaintiff.

Dixon D. Hindley, Salt Lake, UT, for defendant.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter is before the court on defendant's Motion to Suppress statements made to special agents of the Immigration and Naturalization Service (INS). The United States is represented by Michelle M. Christiansen, Assistant United States Attorney, and defendant Tapia–Mendoza is represented by Dixon D. Hindley. Counsel submitted memoranda and supplemental memoranda, after which hearings were conducted on October 20, 1998, and December 22, 1998. Upon submission of additional post hearing briefs, the court took the matter under advisement.

### FACTUAL BACKGROUND

Defendant was arrested on June 26, 1998, in Salt Lake City's Pioneer Park after selling narcotics to an undercover Salt Lake City police officer. INS Special Agent Phillip M. Earnest was on assignment and attached to the Salt Lake City Police Department, and was present at the time of arrest. Agent Earnest is assigned to work with the police department because of the rising number of illegal aliens in the downtown area of the city who have been found to be involved in street level narcotics transactions. His duties with INS and while on assignment to the police department are to assist the police and to seek out and detect aliens who are illegally present in the United States. If he determines that they are here illegally he places detainers and creates paperwork to have them sent back to the country of origin or birth.

Agent Earnest testified that he recognized the defendant from some prior contact in the park where he was arrested or perhaps in connection with a prior immigration matter. He began to talk with defendant after the police placed him under arrest. He addressed the defendant in English and then Spanish and asked some preliminary questions in the nature of booking information. He asked whether the defendant had any immigration documents and what country he claimed as his country of origin. Defendant said "no" concerning immigration documents and stated that he was born in Mexico. Agent Earnest then inquired as to the defendant's name, sex, hair color, color of eyes, complexion, height, weight, the presence of any scars or marks, marital status, par-

ents' names, whether Mr. Tapia–Mendoza had a United States address or had family in the United States, where he was born in Mexico, date of birth, and his current health. Agent Earnest testified that it was his ordinary routine to ask these questions before giving the Miranda warning. Defendant willingly provided the information requested and voluntarily answered the questions. Defendant testified that the questions lasted "a minute at the most." (Transcript of Hearing on October 20, 1998 at p. 52)

After recording the aforesaid preliminary responses, Special Agent Earnest advised defendant of his Miranda rights in Spanish by reading from INS form I–214 which contains a Spanish translation of the rights. Agent Earnest read the entire Miranda questions and warnings in Spanish to defendant and testified that defendant stated that he understood his Miranda rights. In response to a question by the court, the agent said, "I asked if he would agree to talk to me and he said yes." (Tr.—p.27) Agent Earnest read a waiver of rights form to defendant in Spanish and testified: "I asked him if he was willing to talk to me and he said yes. . . . I asked him if he understands his rights and he said he understands the waiver that I read to him. I read him the waiver and asked him if [he] understood it and he said yes he did." (Tr.—p.31) The waiver form was signed by Agent Earnest and another witness because defendant was handcuffed. Agent Earnest then asked some further questions and testified that his purpose in asking the questions was to enable him to fill out INS form I–213, Record of Deportable/Inadmissable Alien, used to track aliens in the United States.

Notwithstanding the custodial setting in which the questions were asked, the court finds from all facts and circumstances presented that defendant answered all questions voluntarily, that he was knowledgeable about his rights, that he understood and agreed to the waiver of his rights, and that he was no stranger to police questioning and procedures.

On July 15, 1998, while still in state custody, the defendant was interviewed by INS Special Agent Kim Meyer. Agent Meyer asked defendant his name and citizenship in order to ascertain that she was speaking with the correct individual. She then advised him of his Miranda rights in Spanish. Agent Meyer speaks fluent Spanish and determined that the defendant fully understood all questions and that he was willing to waive his Miranda rights. He acknowledged to Agent Meyer that he had been advised of Miranda rights before questioning began, and had no objection to talking with the agent. Defendant made several incriminating statements, including admission that he had prior felony convictions in California. Although he had told Agent Earnest that he had never been deported, he told Agent Meyer that he had been deported in 1989, and that he had returned to the U.S. in May 1998 illegally and without permission. He said that he had been arrested before in other proceedings and in states other than Utah, and that he has a "rather good idea" of what a criminal prosecution is. (Tr.—p.51) He told Agent Meyer that he had no trouble communicating with her.

Based upon considerations of credibility and observation of witnesses at the evidentiary hearings, as well as the totality of the evidence there presented, this court finds that defendant's statements to INS Special Agent Earnest and his statements to INS Special Agent Meyer were voluntarily made.

Defendant made no request and was not advised by either INS agent of his right to contact the Mexican Consulate.

## ANALYSIS

Defendant seeks to suppress statements he made to both INS agents on the ground that he is a Mexican national whose international treaty rights were violated because neither agent advised him of his right to speak with a representative of the Mexican Consulate prior to interrogation. Defendant also seeks suppression because

of alleged violation of his Miranda rights. He claims that all statements and evidence obtained after his pre-Miranda admissions that he is a Mexican citizen and that he has no immigration documents should be suppressed as "fruit of the poisonous tree," and that his seizure was in contravention of the Fourth Amendment because he was being investigated solely on the basis of his Hispanic appearance. ·

## I. TREATY RIGHTS

■ Defendant claims that the INS agents failed to comply with provisions of two treaties to which the United States is a party. First, defendant cites *A Consular Convention Between the United States of America and the United Mexican States*, Aug. 12, 1942, U.S.–Mex., art. IV, sec. 3, 57 Stat. 800, 809, for the proposition that Mexican nationals "shall have the right at all times to communicate with the consular offices of their country." This treaty is inapposite under the circumstances of this case because it does not require notice of the right to communicate to be given to Mexican nationals. Also, defendant does not contend that authorities affirmatively denied him the right to so communicate.

The second and more important treaty relied upon by defendant is the *Vienna Convention on Consular Relations*, Apr. 24, 1963, art. 36, 21 U.S.T. 77, 101, 596 U.N.T.S. 261, ("Convention"), to which the United States and Mexico are parties. In relevant part, Article 36 of the Convention requires an arresting government to notify foreign nationals, "without delay," of their right to contact their consul upon being taken into custody. Defendant argues that the Convention provisions are analogous to Miranda rights, and that the government's failure to notify him of his right to contact the Mexican consul mandates the exclusion of evidence obtained in the absence of such notification.

1. The Supreme Court, in *Breard v. Greene*, 523 U.S. 371, ——, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998), suggested in dicta that the Vienna Convention "arguably confers on

■ A threshold question in assessing claims of alleged violations of treaty rights under the Convention is whether the individual seeking redress has standing to assert the alleged violation. Treaties are contracts between or among independent sovereigns. *United States v. Zabaneh*, 837 F.2d 1249 (5th Cir.1988). Consequently, only signatory nations generally have standing to enforce treaty provisions absent evidence, considering the document as a whole, that the signing parties expressly or impliedly intended the treaty to provide independent rights to citizens of either country. *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, (4th Cir.), *cert. denied* 506 U.S. 955, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992). No federal court has ruled that the Vienna Convention confers on individuals such a private enforceable right.[1] Although it is doubtful that such a private right exists, because defendant's claim in the instant case fails for reasons set forth below, this court need not decide that issue at this time.

Assuming without deciding that defendant has standing to challenge a violation of the Convention, his claim for suppression nonetheless must be rejected. In so ruling, this Court follows the Second, Fourth, Fifth, and Ninth circuits all of which impose a requirement that actual prejudice resulting from the alleged violation must be shown before obtaining a remedy. See, *Waldron v. Immigration and Naturalization Serv.*, 17 F.3d 511 (2d Cir.1993); *Murphy v. Netherland*, 116 F.3d 97 (4th Cir.1997); *Faulder v. Johnson*, 81 F.3d 515 (5th Cir.1996); *United States v. Villa–Fabela*, 882 F.2d 434 (9th Cir.1989).

In *Murphy*, the Fourth Circuit set forth the following rationale for such a requirement:

[E]ven if the Vienna Convention on Consular Relations could be said to create

an individual the right to consular assistance following arrest." However, because the claim was procedurally barred, the issue was not ruled upon.

individual rights (as opposed to setting out the rights and obligations of signatory nations), it certainly does not create constitutional rights. Although states may have an obligation under the Supremacy Clause to comply with the provisions of the Vienna Convention, the Supremacy Clause does not convert violations of treaty provisions (regardless whether those provisions can be said to create individual rights) into violations of constitutional rights. Just as a state does not violate a constitutional right merely by violating a federal statute, it does not violate a constitutional right merely by violating a treaty.

116 F.3d 97, 99 (4th Cir.1997). This court agrees with the *Murphy* analysis.

The Supreme Court appears to have adopted the prejudice standard in *Breard v. Greene*, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998). In *Breard*, the petitioner's claim arising under Article 36 of the Vienna Convention was procedurally barred. Nevertheless, the Court considered the prejudice issue and concluded that even if given opportunity for a hearing the petitioner likely would have failed to show adequate prejudice to overturn the lower court's decision. In this regard, the Court said:

> Even were Breard's Vienna Convention claim properly raised and proven, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial.... Breard's asserted prejudice—that had the Vienna convention been followed he would have accepted [a guilty plea]—is far more speculative than the claims of prejudice courts routinely reject in those cases were [sic] an inmate alleges that his plea was infected by attorney error.

523 U.S. 371, ——, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998) (internal citations omitted).

■ The Ninth Circuit in *Villa–Fabela* set forth a three prong test concerning the sufficiency of a defendant's evidence of prejudice:

> To establish prejudice, the defendant must produce evidence that 1) he did not know of his right [to consult the Mexican Consulate]; 2) he would have availed himself of the right had he known of it; and 3) there was a likelihood that contact [with the consul] would have resulted in assistance to him....

882 F.2d 434, 440 (internal quotation marks and citations omitted). This court adopts the same three factors, each of which must be established by a defendant in order to show prejudice.

■ In the present case, defendant may or may not have been aware of his "right" to contact the Mexican Consulate. Defendant has been deported on at least one prior occasion and has knowledge of immigration laws and procedures. In any event, however, defendant did not show and he is unable to show that contacting the Consul would have resulted in assistance to him in this matter. At the December hearing defendant said that he would have liked to contact the Mexican Consul because he "hoped [the Consul] could have made [him] more aware of the [sic] certain rights that [he] may have had." In an Affidavit of the Consul of Mexico submitted by defendant with his Reply Memorandum, it is asserted that if the Consul were contacted by. a detained citizen of Mexico, a representative of the Consulate would visit the citizen and provide advice concerning each of her *Miranda* rights, and that such a defendant would be advised that such rights should be asserted. But defendant had already been notified of his *Miranda* rights in Spanish, and he freely acknowledged that he understood those rights and that he was willing to respond to questions and to waive such rights.

It is apparent that neither defendant's testimony nor the Consulate's affidavit is sufficient to establish prejudice as a result of the government's failure to notify defen-

dant of his alleged right to contact the Mexican Consul. Defendant failed to produce evidence that such contact if made would have resulted in assistance to him beyond his existing knowledge of Miranda warnings and rights. Based upon credible testimony of the INS agents, it was apparent to the court at the hearings that defendant voluntarily answered all questions he was asked, and that he was knowledgeable concerning his *Miranda* rights because of prior contacts with Immigration officials in deportation proceedings and otherwise.

■ In any event, defendant has not presented any authority or precedent for imposing the remedy of suppression of his statements even if, arguendo, his alleged right to consular assistance was violated. The Vienna Convention does not expressly or impliedly provide for the remedy of suppression of statements or confessions where an arresting government fails to notify a foreign national of her right to contact the Consulate. This court declines to imply the existence of such remedy, and rules that the remedy of suppression is not available under the Vienna Convention.[2]

Based upon the foregoing, this court holds that failure to notify defendant Tapia–Mendoza of his Vienna Convention rights under the circumstances of this case does not mandate the suppression of statements made by the defendant to INS agents while he was in custody.

## II. *MIRANDA RIGHTS*

In this case, the INS agents followed *Miranda* by notifying defendant of the familiar enumerated rights, reiterating the warnings and obtaining a waiver of the rights from defendant. Defendant testified at the hearing that he was not advised of his Miranda rights until late in the interviews with the agents, that he did not waive each and every one of the rights and that the waivers were irregular and that they were presented to him after he had been questioned. The INS agents testified otherwise and the court finds their

testimony to be more credible than defendant's testimony, which was contrary to what both INS agents testified that he had said to them.

### *Pre–Miranda Statements—Booking Questions Exception*

Defendant argues that even if the court should find—as it does find—that there was no violation of *Miranda* concerning statements made by defendant after the Miranda warnings were given, the questions initially asked and admitted before giving the Miranda warning elicited incriminating statements which taint and render suppressible all of the subsequent statements and evidence. The court finds otherwise, and considers that most if not all of the short questions initially put by Agent Earnest, which defendant estimated lasted about one minute, were in the nature of eliciting biographical and booking-type information which do not require Miranda warnings.

In *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), a plurality of the Supreme Court declared that "routine booking questions" specifically designed to secure biographical information necessary to complete booking procedures rather than to elicit incriminating responses for investigatory purposes would not require Miranda warnings. 496 U.S. 582, 600–603, 110 S.Ct. 2638 (1990). The Court thus exempted certain statements from suppression under the strictures of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), stating:

> ... the questions fall within a "routine booking question" exception which exempts from Miranda's coverage questions to secure the "biographical data necessary to complete booking or pretrial services."

Id. at 601, 110 S.Ct. 2638.

In *United States v. Parra*, the Tenth Circuit provided further guidance regard-

---

**2.** By rejecting the remedy of suppression of such statements this court does not foreclose the possibility that other remedies may be available.

ing the "routine booking questions" exception:

> The underlying rationale for the exception is that routine booking questions do not constitute interrogation because they do not normally elicit incriminating responses. As the Muniz plurality itself recognized, the police may not ask questions that are designed to elicit incriminating admissions. Thus, where questions regarding normally routine biographical information are designed to elicit incriminating information, the questioning constitutes interrogation subject to the strictures of Miranda.

2 F.3d 1058, 1068 (10th Cir.), *cert. denied,* 510 U.S. 1026, 114 S.Ct. 639, 126 L.Ed.2d 597 (1993) (internal quotation marks and citations omitted).

■ In the case at bar, most of the pre-Miranda questions were harmless questions seeking biographical information appropriate for booking procedures. However, Agent Earnest also asked certain questions apparently aimed at eliciting incriminating responses if the defendant in fact was an illegal alien. Agent Earnest asked the defendant what country he claimed as his country of origin, whether he had any immigration documents, and where in Mexico he was born. Such questions might not qualify as "routine biographical information" necessary for booking an individual accused of illegally selling narcotics. Agent Earnest no doubt suspected that the defendant was an illegal alien, and the questions seem most relevant to the agent's investigation of another offense, namely illegal re-entry into the United States.

Notwithstanding the foregoing, this Court has found that the answers by defendant were given voluntarily. For that reason Agent Earnest's pre-Miranda questions about country of origin and lack of immigration documents should not be suppressed.

### Voluntary Statements Without Miranda Warnings

Responses by defendants in criminal cases to custodial and other questions by proper authorities are governed by a post Miranda statute enacted by Congress, which provides that:

> "a confession ... shall be admissible in evidence if it is voluntarily given." 18 U.S.C.A. § 3501(a).

This court has previously ruled that *Miranda* "rights" are not constitutional rights, and that the statute is controlling. *United States v. Rivas–Lopez,* 988 F.Supp. 1424 (D.Utah 1997). Recently the Fourth Circuit in *United States v. Dickerson,* 166 F.3d 667, 1999 WL 61200 (4th Cir.1999), addressed and upheld the aforesaid statute. In *Dickerson* the court noted that

> it is clear that Congress enacted § 3501 with the express purpose of returning to the pre-Miranda case-by-case determination of whether a confession was voluntary.

> It should be noted that the central purpose of *Miranda* and the familiar questions it mandated are still pertinent and useful in determining whether statements were made voluntarily.

> \* \* \* \* \* \*

> ... lest there be any confusion on the matter, nothing in today's opinion provides those in law enforcement with an incentive to stop giving the now familiar Miranda warnings. As noted above, those warnings are among the factors a district court should consider when determining whether a confession was voluntarily given. See 18 U.S.C.A. § 3501(b). Indeed, federal courts rarely find confessions obtained in technical compliance with Miranda to be involuntary under the Fifth Amendment.... Thus, providing the four Miranda warnings is still the best way to guarantee a finding of voluntariness. Id.

■ It follows from the aforesaid discussion and analysis that although *Miranda* continues to be of importance and helpful in a court's assessment of the voluntariness of confessions and statements, failure to give the Miranda warnings, and irregularities or lack of waivers relative

thereto, are not fatal to the admissibility of such statements and confessions, so long as under the totality of all facts and circumstances they are found to have been given voluntarily.

## III. FOURTH AMENDMENT CLAIM

Finally, defendant asserts that all evidence should be suppressed as "fruit of the poisonous tree" because Agent Earnest's initial questioning on the date of defendant's arrest was motivated solely by the defendant's Hispanic appearance, in violation of the Fourth Amendment.

There is no support in the record for defendant's contention. The only evidence offered on this issue is Agent Earnest's uncontroverted testimony that his questions to defendant were entirely racially neutral. As part of his assignment to the Salt Lake Police Department, and as a general practice, Agent Earnest puts questions to everyone arrested on his shift regardless of race or appearance about their place of birth.[3] Additionally, Agent Earnest recognized the defendant from some prior encounter in the park or some other occasion he could not remember exactly.

This court rejects defendant's unsupported and naked assertion that he was questioned in violation of the Fourth Amendment because of his Hispanic appearance.

Based upon the foregoing, defendant's Motion to Suppress is DENIED in all particulars.

---

**3.** At the December hearing Agent Earnest testified, "I don't make exceptions whether they are Caucasian, African American or Hispanic person. If the police officers have arrested somebody I'll ask him where the country of his birth is, that's my job and at the time when I asked [the defendant] he told me he was from Mexico." (Dec. Tr. 32.)