UNITED STATES of America,

v.

Anselmo CARRILLO, Francisco Soto, Luis Martin Casas, Clayton M. Kendall, Jr., and Francisco Perez.

No. 99 CR 54.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 14, 1999.

George N. Leighton, Earl L. Neal & Associates, Chicago, IL, Steven Shobat, Cesar & Shobat, Chicago, IL, for Anselmo Carrillo, defendant.

George N. Leighton, Earl L. Neal & Associates, Chicago, IL, Ronald F. Neville, Neville, Pappas & Mahoney, Chicago, IL, Linda Amdur, Attorney at Law, Chicago, IL, for Francisco Soto, defendant.

James D. Tunick, Stanley L. Hill & Associates, P.C., Chicago, IL, Matthew Patrick Walsh, Neville, Pappas & Mahoney, Chicago, IL, for Luis Martin Casas, defendant.

Kevin P. Bolger, Kevin P. Bolger & Associates, Chicago, IL, Richard A. Halprin, Attorney at Law, Chicago, IL, for Clayton M Kendall, Jr, defendant.

Ronald Gregory Draper, Attorney at Law, Chicago, IL, for Clayton M Kendall, III, defendant.

Robert Louis Rascia, Serpico, Novelle & Navigato, Ltd., Chicago, IL, for Franscisco Perez, defendant.

Matthew Charles Crowl, U.S. Atty's Office, Chicago, IL, for U.S.

### OPINION and ORDER

NORGLE, District Judge.

Defendants Anselmo Carrillo, Francisco Soto, and Luis Martin Casas (where appropriate, "Defendants") move to dismiss the Government's indictment charging them with various drug-related offenses on the grounds that government agents violated Article 36 of the Vienna Convention on Consular Relations and the Bilateral Consular Convention between the United States and Mexico. Alternatively, Defendants move to suppress certain statements and evidence that were elicited as a result of these treaty violations. For the following reasons, the court denies Defendants' motion.

### I. BACKGROUND [1]

In late summer or early fall 1998, an individual cooperating with the Drug Enforcement Agency ("DEA") provided information that a red Mercury automobile had a trap compartment in it; such trap compartments are commonly used by drug traffickers to transport narcotics.

On January 27, 1999, DEA agents tracked the red Mercury to a driveway at a single family residence on Belmont Place in Addison, Illinois ("the Belmont address"). While the Belmont address was under surveillance, a red Toyota pick-up truck with three Hispanic males pulled into the driveway. One of the individuals got into the red Mercury and drove away, with the red Toyota following.

The two cars then traveled to another residence located on Clarendon Street in Addison ("the Clarendon address"). The red Mercury was driven into a garage alongside a white Ford. For the next two hours, the garage door remained closed as agents heard people talking inside.

Eventually, the agents observed Defendants Francisco Soto and Luis Casas leave the garage and enter the red Toyota. Soto drove away with Casas as his passenger. Agents were unable to maintain surveillance of the red Toyota, allegedly because Soto drove in a manner so as to lose anyone intending to follow him. Defendant Anselmo Carrillo then drove the red Mercury out of the garage. Agents were unable to maintain surveillance of the red Mercury as well, losing sight of it in the vicinity of Lake Street in Addison.

Approximately 20 minutes later, agents saw the red Toyota leaving the parking lot of a cinema on Lake Street. Defendants Carrillo, Soto, and Casas were all in the red Toyota. Parked in the cinema parking lot was the red Mercury.

After the red Toyota drove around for about 10 minutes, apparently in an attempt to lose anyone following, it returned to the cinema parking lot. At that point, agents stopped the red Toyota and placed Carrillo, Soto, and Casas under arrest. On Carrillo's person was a set of keys for the red Mercury and a garage door opener for the Clarendon address.

Carrillo signed a waiver of rights and consent to search the red Mercury. When agents searched the car, they discovered a hydraulically-operated trap compartment behind the rear seat. Inside the trap compartment were 48 one kilogram bricks of cocaine wrapped in clear plastic.

After their arrests, and after being informed of their *Miranda* rights, Carrillo, Soto, and Casas each gave statements. Among other things, all three initially denied having been at the Clarendon address on that day, and Carrillo and Soto denied being at the Belmont address. Agents

---

1. For background purposes only, the court excerpts portions of the Government's version of events leading up to and including Defendants' arrests. The factual accuracy of the Government's version is not relevant for purposes of deciding the motion at bar.

later arrested Defendant Clayton Kendall Jr., and his son, Clayton Kendall III, after they allegedly attempted to find and pick up the red Mercury while they drove through the cinema parking lot. After his arrest, Kendall Jr. stated that he had spoken to unidentified Mexican males over the telephone about the red Mercury, that he knew the car contained cocaine, and that he was paid $5,000 each time he transported the red Mercury containing the cocaine.

On January 27, 1999, DEA agent Michael Nowacoski signed a criminal complaint against Carrillo, Casas, Soto, Kendall Jr., and Kendall III. The charge was knowingly and intentionally possessing with intent to distribute 48 kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). On February 24, 1999, the Government filed a four-count indictment against Carrillo, Soto, Casas, Kendall Jr., and another individual, Francisco Perez. Count I charged Perez, Carrillo, Soto, and Casas with conspiring to distribute cocaine (*see* 21 U.S.C. §§ 841(a)(1), 846); Count II charged Perez, Carillo, Soto, and Casas with knowingly and intentionally possessing with intent to distribute 48 kilograms of cocaine (see § 846(a)(1)); Count III charged Kendall Jr. with knowingly and intentionally possessing with intent to distribute 48 kilograms of cocaine (*see* § 846(a)(1)); and Count IV charged Perez with possession of a firearm by a felon (*see* 18 U.S.C. § 922(g)(1)).

Carrillo, Soto, and Casas now move to dismiss the charges against them or suppress certain evidence on the grounds that the arresting agents violated their rights under Article 36 of the Vienna Convention on Consular Relations ("Vienna Convention"), Apr. 24, 1963, 21 U.S.T. 77, and the Bilateral Consular Convention between the United States and Mexico ("Mexican Bilateral Convention"), Aug. 12, 1942, U.S.–Mex., art. IV, sec. 3, 57 Stat. 800, 809. Defendants argue that because they are aliens to the United States and citizens of Mexico, they had a right under these treaties to communicate with representatives of the Mexican Consulate in Chicago upon their arrests and subsequent custodial interrogation. Defendants concede that they never expressly requested to speak with consular representatives, but contend that their requests were implicit because they told agents that they were Mexican nationals and that they were uncomfortable speaking English. Moreover, Defendants contend that because they were denied consultation with Mexican officials, they were isolated, faced intensive interrogation, and made incriminating statements. In particular, Defendants assert that Soto was led to believe that he had to consent to the search of the red Mercury. Based on these alleged treaty violations, Defendants seek dismissal of the indictment or suppression of certain evidence, a la the exclusionary rule and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In response, the Government does not dispute that its agents did not advise Defendants about any potential rights they might have had pursuant to any international treaty; nor does the Government dispute that the agents failed to notify the Mexican consulate about Defendants' arrests. The Government, however, argues that Defendants do not have standing to enforce the Vienna Convention because "international treaties are contracts between nations" and because the preamble to the Vienna Convention expressly states that it "is not to benefit individuals." (Resp. at 6, 7) (*citing United States v. Mitchell*, 957 F.2d 465, 470–71 (7th Cir. 1992) and *quoting* Preamble to Vienna Convention, 21 U.S.T. 77, 79). Alternatively, the Government argues that Defendants "fail[ ] to demonstrate that any alleged failure to advise them of consular rights prejudiced them." (Resp. at 8.) And, assuming Defendants suffered prejudice, the Government maintains that dismissal of the charges or suppression of evidence is not the appropriate remedy. (Resp. at 10–12.) Finally, the Government argues that the Mexican Bilateral Conven-

tion affords Defendants no relief because it does not require consular notification upon detention of a Mexican national. (Resp. at 12–13.)

Though Defendants do not separately address the two treaties at issue, the court turns first to their assertion of rights under the Vienna Convention.

## II. DISCUSSION

### A. The Vienna Convention

The United Nations adopted the Vienna Convention in April 1963, and the United States and Mexico, along with several other nations, are signatories. *See* Vienna Convention on Consular Relations. April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820. The United States Senate ratified the Vienna Convention on October 22, 1969, and it became effective for Mexico on July 16, 1965. Article 36 of the Vienna Convention provides:

*Communication and contact with nationals of the sending State*

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the freedom with respect to communication with and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 100–01, T.I.A.S. No. 6820.

Defendants rely upon ¶ (1)(b) of Article 36 ("Article 36"), which provides the notification procedures for a signatory government to follow when it arrests or detains a foreign national. Of particular significance here is Article 36(1)(b)'s requirement that "authorities shall inform the [detained foreign national] without delay of his rights under this sub-paragraph." 21 U.S.T. at 101. As already noted, the Government does not dispute that its agents failed to comply with this requirement; and while the Government maintains that Defendants received and waived their *Miranda* rights, it does not directly challenge Defendants' assertion that they impliedly requested notification of the Mexican consulate. It is therefore conceded that the agents violated Article 36(1)(b) of the Vienna Convention.

Nonetheless, the threshold issue is whether Defendants have standing to privately assert (or perhaps more accurately,

enforce) rights under Article 36.[2] The Seventh Circuit has yet to address whether an individual has standing to privately assert rights under this provision. In a different context, however, the Seventh Circuit has stated that "individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved." *Matta–Ballesteros v. Henman,* 896 F.2d 255, 259 (7th Cir.1990). The court of appeals stated further that "'[e]ven where a treaty provides certain benefits for nationals of a particular state—such as fishing rights—it is traditionally held that any rights arising from such provisions are, under international law, those of states ... individual rights are only derivative through the states.'" *Id.* (*quoting United States ex. rel. Lujan v. Gengler,* 510 F.2d 62, 67 (2nd Cir.1975) *quoting in turn* Restatement (Second) of the Foreign Relations Law of the United States § 115 comment (e) (1965)).

In this case, there is no indication that the Mexican government has asserted any rights on behalf of Defendants.[3] Thus, under the authority of *Matta–Ballesteros,* Defendants appear to lack standing to assert individual rights under Article 36. The court's inquiry, however, does not end there.

The Supreme Court has suggested that an individual may be able to assert rights privately under a treaty if the treaty, either expressly or impliedly, provides for a private right of action. *See Argentine Republic v. Amerada Hess Ship. Corp.,* 488 U.S. 428, 442, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Indeed, the Court has stated in dicta that "[t]he Vienna Convention ... arguably confers on an individual the right to consular assistance following arrest. . . ." *Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). And although the Seventh Circuit has yet to address the issue, whether an individual has standing to assert rights under Article 36 has recently become a frequently litigated issue in other courts. *See, e.g., United States v. Lombera–Camorlinga,* 170 F.3d 1241, 1242–43 (9th Cir. 1999) (concluding that an individual has standing), *opinion withdrawn* October 1, 1999, 188 F.3d 1177, 1999 WL 787431, at *1; *United States v. Rodrigues,* 68 F.Supp.2d 178, 181–183 (E.D.N.Y. 1999) (stating that an individual probably does have standing, but declining to decide the issue conclusively); *United States v. Torres–Del Muro,* 58 F.Supp.2d 931, 933 (C.D.Ill. 1999) (concluding that an individual has standing); *United States v. Hongla–Yamche,* 55 F.Supp.2d 74, 77–78 (D.Mass. 1999) (same); *United States v. Alvarado–Torres,* 45 F.Supp.2d 986, 988–89 (S.D.Cal. 1999) (following *Lombera–Camorlinga* to conclude that an individual has standing); *United States v. Kevin,* 97 CR 763JK, 1999 WL 194749, at *3 (S.D.N.Y. Apr.7, 1999) (addressing but declining to decide the issue of standing); *United States v. Tapia–Mendoza,* 41 F.Supp.2d 1250, 1253 (D.Utah 1999) (stating that it is "doubtful" that an individual has standing, but declining to decide the issue conclusively); *United States v. Superville,* 40 F.Supp.2d 672, 678 (D.Vi.1999) (concluding that an individual has standing); *United States v. Chaparro–Alcantara,* 37 F.Supp.2d 1122, 1125

**2.** The issue of whether an individual has standing under a treaty is also often analyzed in terms of whether the treaty is "self-executing" or affords a "private right of action." For a quick review on the precise meaning of standing, see *Gillespie v. City of Indianapolis,* 185 F.3d 693, 701 (7th Cir.1999).

**3.** In fact, there is not indication, even at this stage, that either Defendants or their attorneys have attempted to notify Mexican authorities about their arrests. At several court appearances, the court provided Defendants an opportunity to speak through interpreters and after consultation with their attorneys; nonetheless, neither Defendants nor their attorneys asserted the issue of consular notification. Moreover, the court underscores that Defendants have telephone access at the Metropolitan Correctional Center, where they are currently incarcerated. *See Generally Tucker v. Randall,* 948 F.2d 388, 390–91 (7th Cir. 1991); *Carter v. O'Sullivan,* 924 F.Supp. 903, 909 (C.D.Ill.1996).

(C.D.Ill.1999) (same); *United States v. $69,530.00,* 22 F.Supp.2d 593, 594 (W.D.Tex.1998) (same, in a civil forfeiture case); *United States v. Esparza–Ponce,* 7 F.Supp.2d 1084 (S.D.Cal.1998) (stating that the issue is "murky" and that several factors indicate individual standing, but declining to decide the issue conclusively); *Republic of Paraguay v. Allen,* 949 F.Supp. 1269, 1274 (E.D.Va.1996) (discussing whether the Vienna Convention is "self-executing" and suggesting that an individual does not have standing), *aff'd* 134 F.3d 622 (4th Cir.), *cert. denied,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998); *Kasi v. Commonwealth,* 256 Va. 407, 508 S.E.2d 57, 64 (1998) (stating that Article 36 creates no legally enforceable individual rights).[4]

Thus, the court turns to the language of the Vienna Convention to review whether it confers standing upon an individual. The Vienna Convention does not contain a clear statement on individual rights. However, as the Government points out, as it has in many of the above-cited cases, the preamble to the Vienna Convention states that "the purpose of the privileges and immunities [provided] is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." Preamble, 21 U.S.T. 77, 79. Further, Article 36 states that its "view" is "to facilitat[e] the exercise of consular functions relating to nationals of the sending State...." 21 U.S.T. at 100.

On the other hand, several courts have found that language in ¶ 1(b) of Article 36 implies a private right of action: "The said authorities shall inform the person concerned without delay *of his rights* under this sub-paragraph." Article 36(1)(b) (emphasis added); *see Lombera–Camorlinga,* 170 F.3d at 1242 (opinion withdrawn Oct. 1, 1999); *Rodrigues,* 68 F.Supp.2d at 181–182; *Hongla–Yamche,* 55 F.Supp.2d at 77; *Superville,* 40 F.Supp.2d at 677; *Chaparro–Alcantara,* 37 F.Supp.2d at 1124–25; *Esparza–Ponce,* 7 F.Supp.2d at 1095. Moreover, at least one court has noted two other factors supporting a private right of action: (1) pre-adoption statements by the drafters of Article 36; and (2) other signatory nations' recognition of such a right. *See Rodrigues,* 68 F.Supp.2d at 182 .

While several factors weigh in favor of recognizing a private right of action under Article 36, this court agrees with those courts that have found it unnecessary to decide the issue conclusively. Even assuming that Defendants have standing and the agents violated their rights under Article 36, their motion to dismiss or suppress must fail. As explained below, a violation of Article 36(1)(b) neither warrants nor mandates that a court take the drastic measure of dismissing an indictment or suppressing evidence.

■ That said, it is not the court's intention to deprecate the seriousness of a treaty violation, including the one that apparently occurred here. Indeed, Article VI, Clause 2, of the Constitution, better known as the Supremacy Clause, provides:

> This Constitution and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land.

U.S. CONST. art. VI, cl. 2. Thus, "[b]y the Constitution a treaty is placed on the same footing, and made of like obligation,

---

**4.** This is a non-exhaustive list of cases, though the court did not find any reported decision from the Northern District of Illinois that addresses the standing issue. For an excellent discussion of Article 36 and the standing issue, see Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul,* 18 Mich.J. Int'l L. 565, 594 (Summer 1997). For a more comprehensive overview of individual rights under treaties, see Carlos Manuel Vazquez, *Treaty–Based Rights and Remedies of Individuals,* 92 Colum.L.Rev. 1082, 1119 (1992).

with an act of legislation...." *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888). Treaty violations not only undermine the "Law of the Land," but also international law, where reciprocity is key. If American law enforcement officials disregard, or perhaps more accurately, remain unaware of the notification provision in Article 36, then officials of foreign signatories are likely to flout those obligations when they detain American citizens.[5] The court turns now to Defendants' argument that dismissal or suppression is the proper remedy for the agents' treaty violation.

■ Most courts that have considered the appropriate remedy for an Article 36 violation have first required the foreign national to show that he suffered prejudice as a result of the violation. *See Lombera–Camorlinga,* 170 F.3d at 1244 (opinion withdrawn Oct. 1, 1999); *Rodrigues,* at 182–185; *Kevin,* 1999 WL 194749, at *4; *United States v. Miranda,* 65 F.Supp.2d 1002, 1005 (D.Minn.1999); *Alvarado–Torres,* 45 F.Supp.2d at 989–93; *Tapia–Mendoza,* 41 F.Supp.2d at 1253; *Superville,* 40 F.Supp.2d at 678; *Chaparro–Alcantara,* 37 F.Supp.2d at 1126; *Esparza–Ponce,* 7 F.Supp.2d at 1096. *But see Torres–Del Muro,* 58 F.Supp.2d at 933 (skipping any discussion of prejudice and proceeding to what the appropriate remedy is). The Government, following the lead of this authority, argues that Defendants cannot establish prejudice. The Government notes that Defendants do not dispute that they were advised of their *Miranda* rights and that they waived those rights. Thus, the Government argues, any consultation from the Mexican consulate would have been merely repetitive. Further, the Govern-

ment argues that the Vienna Convention does not require that a detained foreign national be allowed to speak to his consulate before interrogation commences. Several courts have found the Government's arguments persuasive in other cases. *See Rodrigues,* at 183–184; *Alvarado–Torres,* 45 F.Supp.2d at 990–93; *Tapia–Mendoza,* 41 F.Supp.2d at 1254–55; *Chaparro–Alcantara,* 37 F.Supp.2d at 1126.

Defendants do not challenge the Government's forceful arguments in their reply brief and instead request a hearing. Defendants' failure to respond arguably forfeits their opportunity to show prejudice, *see Kevin,* 1999 WL 194749, at *4, and a hearing is not required because the court need not decide whether Defendants have met their burden. Even assuming Defendants suffered prejudice, dismissal or suppression of evidence is not the appropriate remedy for a violation of Article 36.

At the outset, the court has not found any authority indicating that the drastic step of dismissing an indictment would be the appropriate remedy for violations of Article 36; the Vienna Convention contains no such provision. Given this lack of authority and the absence of any grounds to warrant dismissal, the court rejects Defendants' request for dismissal outright. *See Kevin,* 1999 WL 194749, at *4 (rejecting "extraordinary remedy" of dismissing indictment); *Alvarado–Torres,* 45 F.Supp.2d at 993–94; *cf. United States v. Miller,* 891 F.2d 1265, 1267 (7th Cir.1989) (stating that a bar to prosecution is not the remedy for governmental misconduct); *United States*

---

**5.** The State Department has issued a publication addressing a foreign national's rights under Article 36, entitled: *"Consular Notification and Access: Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them."* The Government has attached a copy of portions of this publication to its response brief. In the publication, the State Department instructs law enforcement officials about the treaty's requirements, including the obligation to inform a detained foreign national of his right to consular notification. *See also* 28 C.F.R. § 50.5 (Department of Justice general regulation addressing notification of consular officers); 8 C.F.R. § 236.1(e) (formerly 8 C.F.R. § 242.2(g) (INS regulation)).

*v. D'Antoni,* 874 F.2d 1214, 1219 (7th Cir. 1989).

■ Some courts, however, have discussed whether suppression of evidence is the appropriate remedy for a violation of Article 36. *See, e.g., Rodrigues,* at 184–185 ; *Torres–Del Muro,* 58 F.Supp.2d at at 933; *Alvarado–Torres,* 45 F.Supp.2d at 993–94; *Tapia–Mendoza,* 41 F.Supp.2d at 1255; *Chaparro–Alcantara,* 37 F.Supp.2d at 1125. As noted, that is what Defendants seek here as an alternative to dismissal. In short, Defendants seek to invoke the exclusionary rule as a remedy for a treaty violation.

"The exclusionary rule operates as judicially created remedy designed to safeguard against future violations of ... [constitutional] rights through the rule's general deterrent effect." *Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995); *see also Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (stating that the purpose of exclusionary rule is to deter police from violating individual's constitutional rights). Specifically, the exclusionary rule operates to suppress evidence where the government has violated an individual's constitutional rights under the Fourth, Fifth, or Sixth Amendments. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Fifth Amendment); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) (Sixth Amendment); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Fourth Amendment). Thus, "the exclusionary rule is generally not available for a violation of [a] statute." *Chaparro–Alcantara,* 37 F.Supp.2d at 1125; *see also Rodrigues,* at 184–185 ("as the effect of applying the exclusionary rule is the loss of relevant and probative evidence, this remedy is not applied for every violation of a federal law but is reserved only for breaches of the most basic constitutional rights."); *Torres–Del Muro,* 58

F.Supp.2d at 933; *Alvarado–Torres,* 45 F.Supp.2d at 994. The statute must expressly provide suppression as a remedy. *See id.*

The Vienna Convention, a treaty equivalent to a federal statute, does not provide suppression as a remedy. *See United States v. Ademaj,* 170 F.3d 58, 67 (1st Cir.1999) ("[T]he Vienna Convention itself prescribes no judicial remedy or other recourse for its violation ...."). Moreover, it is well established that the Vienna Convention does not create any fundamental, constitutional rights. *See Alvarado–Torres,* 45 F.Supp.2d at 994 (*citing Murphy v. Netherland,* 116 F.3d 97, 100 (4th Cir.), *cert. denied* 521 U.S. 1144, 118 S.Ct. 26, 138 L.Ed.2d 1050 (1997); *Waldron v. I.N.S.,* 17 F.3d 511, 518 (2nd Cir.1993); *Esparza–Ponce,* 7 F.Supp.2d at 1097); *see also Rodrigues,* at 184–185 ; *Chaparro–Alcantara,* 37 F.Supp.2d at 1125. Put another way, a violation way, a violation of the Article 36 does not rise to the level of a constitutional violation. *See Rodrigues,* at 184–185; *Chaparro–Alcantara,* 37 F.Supp.2d at 1125. As one court has explained:

A convention or treaty signed by the United States does not alter or add to our Constitution. Such international agreements are important and are entitled to enforcement, as written, but they are not the bedrock and foundation of our essential liberties and accordingly should not be cloaked with the nontextual and unprecedented remedy [*i.e.,* the exclusionary rule] that protects those liberties.

*$69,530.00,* 22 F.Supp.2d at 595 (citation omitted).

For these reasons, the court concludes that suppression of evidence is not a remedy available to Defendants for a violation of Article 36. A wealth of well-reasoned case law supports this conclusion, and the court has not found any case that has held to the contrary.[6] Further, Defendants

---

**6.** The court has found only one case—*United*     *States v. Lombera–Camorlinga,* 170 F.3d 1241,

were advised of their rights under the United States Constitution. Defendants' motion to suppress based on the agents' violation of Article 36 is denied.

### B. The Mexican Bilateral Convention

 Defendants also argue that the agents violated their right to notification under the following language of the Mexican Bilateral Convention: "Nationals of either High Contracting Party shall have the right at all times to communicate with consular offices of their country." Mexican Bilateral Convention, Aug. 12, 1942, U.S.–Mex., art. IV, sec. 3, 57 Stat. 800, 809. Defendants' argument is without merit.

First, unlike Article 36, the Mexican Bilateral Convention imposes no affirmative duty upon government actors to inform a foreign national of his notification rights. *See Tapia–Mendoza,* 41 F.Supp.2d at 1253. *But see Consulate General of Mexico v. Phillips,* 17 F.Supp.2d 1318, 1321 (S.D.Fla. 1998) (addressing Mexican consulate's rights under the treaty and finding that the Mexican Bilateral Convention, like the Vienna convention, requires notification). Furthermore, the court's reasoning rejecting Defendants' claim under the Vienna Convention applies equally here. That is, even assuming a treaty violation occurred and Defendants have standing, they are not entitled dismissal of the indictment or suppression of evidence.

1244 (9th Cir.1999)—that arguably suggests that suppression is the appropriate remedy for a violation of Article 36. The Ninth Circuit, however, stopped short of actually reaching that conclusion as it remanded the case to the district court for further proceedings. *See id.* Most importantly, however, a majority of active Ninth Circuit judges recently voted to withdraw that opinion and re-hear the case en banc. *See United States v. Lombera–Camorlinga,* 188 F.3d 1177, 1999 WL 787431, at *1 (9th Cir. Oct.1, 1999). Regardless of the ultimate outcome in that case, this court is not bound to follow decisions of the Ninth Circuit. One other court, the Magistrate Court for the District of Minnesota, issued a Report recommending the suppression of certain

### III. CONCLUSION

Defendants' attempt to invoke the exclusionary rule based on alleged violations of the Vienna Convention and the Mexican Bilateral Convention is without merit. The exclusionary rule, a source of increasing debate in recent years, *see $69,530.00,* 22 F.Supp.2d at 595 (citing articles),[7] "imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence." *Colorado v. Connelly,* 479 U.S. 157, 166, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *see also United States v. Janis,* 428 U.S. 433, 447, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *United States v. Payner,* 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). While the treaty violations alleged here should not be treated lightly, they are insufficient grounds to impose the extraordinary remedy of dismissal or suppression. It should also be emphasized that Defendants were advised of their rights under the United States Constitution. Defendants' motion to dismiss the indictment, or alternatively, to suppress evidence, is denied.

IT IS SO ORDERED.

statements based on a violation of Article 36. *See Miranda,* 65 F.Supp.2d at 1004. The district court, however, rejected that recommendation because the defendant failed to establish prejudice. *See id.* at 1007.

7. *Cf. generally United States v. Dickerson,* 166 F.3d 667 (4th Cir.1999) (holding that a federal statute. 18 U.S.C. § 3501, allows a voluntary confession to be admitted despite federal agents' violation of *Miranda*), *petition for certiorari filed* July 30, 1999; *Davis v. United States,* 512 U.S. 452, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (Scalia, J. concurring) (emphasizing that § 3501 governs the admissibility of confessions in federal court).